IN THE UNITES STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA,
CHARLOTTE DIVISION

UNITED STATES OF AMERICA

vs.                                                                                          No.  3:97CR-23

AQUILA MARCIVICCI BARNETTE,

   Defendant
_____/

DEFENDANT'S BRIEF ON WHAT THIS COURT SHOULD
CONSIDER UNDER *MILLER-EL V. DRETKE*, 545 U.S. 231 (2005)

Comes the Defendant, Aquila Marcivicci Barnette, by and through appointed counsel, and, pursuant to this Court's Order of November 30, 2007, presents the following brief on this Court's questions, to-wit: "Barnette shall file a brief with the Court stating how the Court should proceed in this matter, identifying the evidence that the Court can and should consider, and addressing the effect, if any, of waiver, *see e.g. Davis v. Baltimore Gas & Elec. Co*., 160 F.3d 1023, 1027 (4th Cir. 1998)."   DN 634, p. 3.

I.  **INTRODUCTION**:  A *Batson* challenge sparks a three step inquiry.  *Rice v. Collins*, 126 S.Ct. 969, 973 (2006).  "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. If so, then the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id*. (citations omitted).  Third, the trial court must "assess the plausibility of that reason in light of all of the evidence with a bearing on it." *Miller El v. Dretke,* 545 U.S. 231, 252 (2005)(*Miller-El II*).  This final step involves evaluating the "'persuasiveness of the

1

justification' proffered by the prosecutor ...." *Rice,* 126 S.Ct at 974 (*quoting Purkett v. Elem*, 514 U.S. 765, 768 (1995)(per curiam)). As this Court noted in its November 30, 2007, Order, "only the third prong of the *Batson* test – whether there was purposeful discrimination on the part of the prosecutor – is before this Court on remand." DN 634, p. 2.

    **II. The *Batson* Challenges**: During voir dire in this case, 12 previously qualified potential jurors were placed in the jury box. The government exercised its first set of peremptory challenges. Five jurors were struck, two of whom were African American women, Carla Bryson and Regina Sanders. Defense counsel objected under *Batson*, arguing that "their answers were no different than anyone else" (R. 2254), and asked for the Court to conduct comparative juror analysis. The government gave what on its face was a race-neutral basis for the strikes, and this Court held that "in both of these cases the government has made a race neutral explanation." R. 2299. The credibility of the government's explanation was not expressly addressed. These five jurors were replaced, whereupon the government exercised a peremptory challenge to Debra Moore, another African American female. Defense counsel made a *Batson* challenge and argued that the government had with its first six challenges excused three African Americans. (R. 2305) The government gave what on its face was a race-neutral explanation, and this Court found "that to be a race neutral explanation." R. 2307. The credibility of the government's explanation was not addressed. When it was the government's turn to strike again, it struck three persons, among them David Miller (an African-American male) and Karen Sanders (an African American female). Defense counsel challenged the strike of Ms. Sanders, the government gave an on-its-face race-neutral explanation, defense counsel argued that cumulatively the government had exercised five of nine strikes against African Americans, and this Court held that the government

2

"explanation is race neutral." R. 2319.  The credibility of the government's explanation was not addressed.   The next opportunity for the government to exercise a strike resulted in the dismissal of African-American juror Mark Blakeney.  A *Batson* challenge was made, the government offered an explanation, and this Court found that "a race neutral explanation has been presented." R. 2323.  This Court also stated that "even when one considers the overall pattern of strikes of the government" no racial purpose was shown.  R. 2324.   Again, this  Court did not expressly consider whether the government's explanations were credible in light of the record as a whole.

### III.  The Fourth Circuit's Remand

*A.  The Appeal*:  Barnette raised *Batson* claims on appeal.  He argued, *inter alia*, that a comparison of the voir dire answers given by African-American jurors who were, with white jurors who were not,  peremptorily struck by the Government, showed that the reasons provided by the government for peremptorily striking African-Americans were pretext.   Based upon Fourth Circuit precedent that "'*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excluded and the other is not,'" *United States v. Barnette*, 390 F.3d 775, 796 (4th Cir. 2004)(quoting *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997)), the Circuit Court did not expressly consider side-by side juror comparisons.  Rather, like this Court, upon determining that the prosecutor  had given a facially race-neutral reason,  *id.*, 390 F.3d at 795 - 797, the Circuit Court found no *Batson* violation.

*B.  Miller-El II and the Supreme Court's remand to the Circuit Court*:  Appellant filed a petition for writ of certiorari in the United States Supreme Court before *Miller-El II* was decided.  That petition was pending when the Court issued its opinion in *Miller-El II*.  In *Miller-El II*, the

3

Supreme Court held that step three of *Batson*, the step at which the Court must assess "'the totality of the relevant facts'" in determining the prosecutor's intent in striking black prospective jurors, *Miller-El II*, 545 U.S. at 239 (quoting *Batson*, 476 U.S., at 94), involves a penetrating court inquiry. To answer this Court's question in its November 30, 2007, Order, under *Miller-El II* this Court must "assess the plausibility" of the prosecutors' stated reasons for strikes "in light of all of the evidence bearing on it." 545 U.S. at 242  This includes: the percentages of black and white venirepersons peremptorily struck by the prosecution, 545 U.S. at 241; the characteristics, other than race, of blacks the prosecution struck and of whites the prosecution did not challenge, *id.*; the ways in which the prosecutor questioned black and white venirepersons, *i.e.*, whether they were asked different questions, *id.*, 545 U.S. at 255-264; and the reasons given by the prosecutor for the strikes of blacks, and the extent to which the record supports those reasons.

The Supreme Court also held in *Miller-El II* that the best evidence of what was on the prosecutor's minds when exercising peremptory strikes, "an undeniable explanation of what was going on," *Miller-El II*, 545 U.S. at 266, would be their own handwritten notes on their copies of the juror questionnaires or cards. "Prosecutors here 'marked the race of each prospective juror on their juror cards.'" *Id.*, 545 U.S. at 264 (citation omitted). "[T]he prosecutor's own notes" illustrate that "emphasis on race was on their minds as they considered each potential juror." *Id.*, 545 U.S. at 266.

Given the *Miller-El II* decision, Barnette filed a supplemental petition for writ of certiorari, noting that another North Carolina, Fourth Circuit, *Batson* case, *Kandies v. Polk*, 385 F.3d 457 (4th Cir. 2004), had been reversed and remanded in light of *Miller-El II*. *See Kandies v.*

4

*Polk*, 125 S.Ct. 2974 (2005). Barnette argued that the circuit precedent relied upon in *Kandies* and in his own case conflicted with *Miller-El II* in many ways. Thereafter, the Supreme Court reversed the Circuit Court decision herein and remanded the case in light of *Miller-El II*, just as it had done in *Kandies*.[1]

   *C. Motion to Remand to District Court, and the Fourth Circuit's Ultimate Remand*

   1. <u>Motion for remand</u>:  Upon the Supreme Court's remand of this case to the Circuit Court, counsel for Appellant filed a motion asking that the case be remanded immediately to this Court for determination of the *Miller-El II* issue.[2] The government opposed this motion, but agreed to additional briefing in the Circuit Court. The Circuit Court ordered additional briefing but deferred action on the request for remand and oral argument.

   2. <u>Briefing – the matter of the prosecutor's race notations and remand order</u>:  In his brief on remand in the Circuit Court, Appellant first brought to the Circuit Court's attention that the prosecutors in the trial court had hand-noted the race and gender of the jurors on at least one and presumably all of the juror questionnaires:

---

[1]*Kandies* involves a 28 USC § 2254 action, not a direct appeal.

[2]Appellant asserted that:

> *Miller-El II* demonstrated that a careful and searching review of the entire record of the case is necessary to proper adjudication of a *Batson* claim. Indeed, such a review consumed a full twenty-six pages of the majority's slip opinion. *See also Miller-El*, 125 S. Ct. at 2339 ("It is true, of course, that at some points the significance of Miller-El's evidence is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination."). The district court is better positioned to undertake this extensive cumulative review in the first instance.

*See* Motion To Remand To The United States District Court For The Western District Of North Carolina For Further Proceedings Or, In The Alternative, To Allow Supplemental Briefing And [Oral] Argument, p. 3, Circuit Docket Number 01-20.

Every potential juror at Appellant's re-sentencing filled out a 129-question juror questionnaire well before trial began. Counsel reviewed those questionnaires in preparation for voir dire, and every potential juror was thanked for and/or quizzed about their written answers.

The prosecutors in this case read the 129 answers from its copies of each juror questionnaire and then handwrote on the top of the first page of at least one of them the most salient information taken from those answers:

**B/F**

for black female. The prosecutors then systematically and peremptorily removed five, qualified, black females, from juror service.[3]

In the conclusion of his Supplemental Brief, Appellant urged the Circuit Court to require

the prosecutors to explain themselves by remanding the case to this Court:

---

[3][footnote in brief in circuit court]: The government's copy of the questionnaire of juror Betty Campbell is in the government's Supplemental Joint Appendix at 143. Ms. Campbell checked boxes on page 2 (which is on the back of page 1) indicating that she was a black female. It is the very first question and answer. The government intentionally wrote on the top of page 1 that which plainly appeared on the back. A person looking at page 1 would know immediately the race and gender of the juror.

The reason the government's copy of the questionnaire is in its Supplemental Joint Appendix is that trial defense counsel Harold Bender, who is co-counsel on appeal, advises that the court copies of the juror questionnaires were placed under seal in the district court after jury selection. Because during jury selection every single juror was thanked for or questioned about his or her questionnaire, the questionnaires are pertinent to this appeal. The government put one complete copy of the questionnaires in its Supplemental Appendix, Ms. Campbell's, who was excused for cause and not peremptorily. The other six questionnaires included by the government in its Supplemental Appendix (and the two provided by the government and contained in the Second Supplemental Appendix) do not contain page one of the questionnaires. Perhaps that is because the government did not want to duplicate a page, page 1, that is a "form" page. Perhaps it is because every one of the first pages have the prosecutor's handwritten notation of the race/gender of the potential juror. Counsel for Appellant requested that the government provide the missing first pages, and the government complied by fax on August 9, 2006. However, counsel for the government advised undersigned counsel that he would or might edit or cover some handwritten notes on the pages, ostensibly as claimed work product. The faxed first pages thereafter received by Appellant's counsel did not have "B/F" or similar notes on them, but it is impossible to determine whether such notes were "whited out" or covered up before faxing.

6

> As set out in footnote 2 and accompanying text, *supra*, the government noted at
> As previously shown, the top of at least one juror questionnaire that the juror was
> a "B/F." Why? The government ought to be required to explain why, and how
> often, the race of a potential juror was handwritten by the prosecutor at the top of
> the prosecutor's copy of that juror's questionnaire. That is best done in the
> district court. And the government ought to explain to this Court why it
> submitted six other copies of its juror questionnaires sans page 1 in its
> Supplemental Joint Appendix.

Supplemental Brief of Appellant, Circuit Case Number 02-20, p. 14 . The government filed a supplemental brief arguing that its handwritten notations were not grounds for a remand. The government's argument that "This Court Should Not Remand for Evidentiary Proceedings" based on its position that noting race and gender on questionnaires was not relevant to step three of *Batson*, Appellee's Supplemental Brief, pp. 17-18, Case No. 02-20, was rejected ten months later when the Circuit Court granted Appellant's Motion to Remand to this Court.

**III. This Court should order a new sentencing proceeding:** The overall pattern of strikes in a side-by -side comparison shows that the Government's stated reasons for their strikes were pretext.

(1) **Ms. Bryson**, an African-American potential juror, stated that her father was in law enforcement and she believed that people in law enforcement were more inclined to be honest than members of the general population. R. 1243. She said "I can't really say I'm for the death penalty or against it." R. 1245. She said she was "a straggler.... sometimes I'm for it; sometimes I'm against it. It's really nothing I've ever considered, you know, am I for it or am I against it." *Id*. She said that she could return a life sentence or the death penalty. R. 1247. The government said the basis for her excusal was that "she was not sure whether she favored abolishing the death penalty; and marked on the questionnaire that she was uncertain about how she felt on the death penalty... called herself a straddler." R. 2296.

7

However, the government did not excuse juror **Edwards**, who is white, and who acknowledged in her questionnaire "that no matter what the facts or circumstances are, . . . you would always impose life imprisonment and not consider the potential death penalty as a punishment." R. 1017. Ms. Edwards stated, "I think what I was trying to go with there is to say always and never, you know, I don't know. I think given - - I think I would have to hear the evidence and I think I would go with what the law dictated based on what I heard in a particular case." *Id.* She also stated: "Well, I think, as I said on there, I think it's - - I don't think anybody wins. I think it's a sad situation for both sides. I think if the situation warrants it beyond a shadow of a doubt in my mind and that's what the law allows in that case, I think I could impose it." *Id.*

And the government did not excuse white juror **Deana Stanford**. In her answers on her questionnaire, Stanford said that she was not sure if she favored abolishing the death penalty, she was uncertain how she felt about the death penalty, and she left completely blank "what is your personal view about the death penalty?" (2d Supp. J.A. 23 - 25). Indeed, the government's copy of the questionnaire, made available for the court here, has that large "completely blank" space on the questionnaire circled because the government wanted to ask about it. (*Id.* at 25.). During voir dire the following exchanges occurred:

Would you please tell us your opinions on the death penalty?

A. I think in certain circumstances that it's probably warranted.

Q. However, you did note you don't feel strongly *at all* about it. Would you tell us what has helped to formulate your opinions on the death penalty?
......

A. I think what I meant is I don't feel a definite one way. I think it would depend on the case.

8

Q. You said - - You did check here, "*I am uncertain* how I feel about the death penalty."

A. I think I was responding to uncertain whether I'm a solid - - *I'm not solid one way or the other*.

Q. Can you keep - - equally and fairly can you keep both punishments or penalties in your consideration?

A. Yeah. Oh, yeah.

R. 1962 (emphasis added).

The government's actions with respect to jurors Stanford and Edwards--white, unexcused, jurors--when compared, side by side, with its actions with respect to excused, African-American potential juror Bryson–and with the following four other excused African-American potential jurors–reveal the government's race-neutral explanations to have been pretext. *Miller-El II*, 125 S.Ct at 2330 ("The fact that [the prosecutor's] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext.").

(2) **Regina Sanders**, an African-American, stated that she could impose the death penalty "depending on the case, it could be applied in one case and not applied in another." R. 891. She stated that in some cases the death penalty is applied "unfairly" based upon "socioeconomic backgrounds, certain race, certain age." R. 893. She did not say that she was opposed to the death penalty, and she said she would follow the law with an open mind. R. 894. The government excused her, saying it was because of her belief that the death penalty is sometimes imposed unfairly and because the juror "was not sure she could be fair." R. 2299. In fact, Ms. Sanders said that she would be fair and keep an open mind, in direct response to the government's question. R. 893.

(3) **Debra Moore**, an African-American, stated that "I don't have an opinion about" the

9

death penalty. R. 1919. She said her religion says that God, not people, determines life and death, but that "I don't think my religion would have any bearing on that." R. 1921. She was thoughtful in her responses, pausing, but she said that the parties were on an equal playing field and she would "fairly consider both potential penalties." R. 1922. The government excused this juror, stating she "hesitated" in answering the question of whether the parties would start on a level playing field, and that Moore had said that she did not know whether she would go against her religion. R. 2306-07.[4] Pausing before answering a question is being no more hesitant than saying, as not-excused Deana Stanford did: "*I am uncertain* how I feel about the death penalty;" and "*I'm not solid one way or the other*." R. 1962.

    (4) **Karen Sanders**, an African-American, stated that she was "kind of torn between the death penalty. Just kind of depends, I guess, really on the case and just hearing the details and

---

[4]In fact, the actual exchange was:

    Q. Would you be able to go against your religion?

    A. I would be willing to listen to the facts, whatever is presented, and make a decision based on that.

    Q. What –

    A. I – I don't know.

    Q. What if the facts went a way that went against your religion?

    A. I'm sorry, what did you say?

    Q. What if the facts were in opposition given your position, given your religion, what then?

    A. I don't think my religion would have any bearing on that.

R. 1920-21.

more information about it." R. 1075. "I don't really have a strong yes for death penalty and I don't have a strong no for the death penalty. It just depends on the situation." R. 1076. She said she had misunderstood the juror questionnaire, and that she would not always vote for life imprisonment. R. 1078. She considered herself to be conservative politically and stated that she would give equal consideration to either sentence. R. 1076 -78. Her answers were substantially similar to Juror Stanford's and Edwards'. However, the government stated that she was excused because of her hesitancy and uncertainty about the death penalty. R. 2319.

(5) **Mr. Blakeney**, an African-American, stated that he had not really thought much about the death penalty, that he did not strongly support it, and that he felt a little uncomfortable because "I don't want, you know, to sentence nobody to death," but that he would if the law and the facts required it. J.A. 1152b. The Government excused him, again because of hesitancy, but also because he had said he did not want to sentence anybody to death. But, it is to be hoped, *few* jurors *want* to sentence a person to death.

The government used five strikes to remove black jurors who said roughly the same thing that retained white jurors said, a "pattern" that *Batson* prohibits. Surely (1) the number of strikes[5] + (2) identical reasons + (3) side-by-side comparative juror analysis + *(4) hand-noting the race of jurors on questionnaires* when the face of the questionnaire already showed race, undermine the government's credibility at step three of *Batson*. "The whole of the voir dire testimony subject to consideration casts the prosecution's reasons for striking [these potential jurors] in an implausible light." *Miller-El II*, 545 U.S. at 252. "[W]hen th[e] evidence . . . is viewed cumulatively its direction is too powerful to conclude anything but discrimination."

---

[5]Removing 5 qualified black females ("B/F") has probative value because it is unlikely to occur by "happenstance." *Miller El II*, 545 U.S. at 240 (quoting *Miller-El I).*

11

*Miller-El II*, 545 U.S. at 265. The government's stated reasons were pretext, and Defendant is entitled to a capital sentencing before a new, constitutionally impaneled, jury.

### IV. In the Alternative, the Court Should Unseal and Provide Counsel With All Juror Questionnaires, and Order the Government to Provide All *Brady* Evidence Bearing on the *Miller-El II* Issues, and Then Conduct a *Miller-El II* Hearing

a. In answer to the question posed in this Court's November 30, 2007, Order, *any* direct or circumstantial evidence that the government's stated reasons for excusing qualified African-American jurors were pretextual must be considered by this Court at step three of *Batson*.[6]

b. One important source of pretext can be revealed by the Court and counsel learning the answers by jurors on their questionnaires and then comparing how jurors who answered the same

---

[6]This Court also asked the parties to address "the effect, if any, of waiver, *see e.g. Davis v. Baltimore Gas & Elec. Co*., 160 F.3d 1023, 1027 (4th Cir. 1998)." DN 634, p. 3. In *Davis*, the Court found that once a party "offer[s] a legitimate reason for exercising the strikes" if there is "no further comment on the matter" then there is "a waiver of the initial objection." 160 F.3d at 1027. This understanding of the matter was later repeated in *Kandies v. Polk*, 385 F.3d 457, 474 (4th Cir. 2004), in Judge Gregory's separate opinion in which he wrote that "[h]aving failed to argue that the State's proffered reasons were pretextual, Kandies waived his *Batson* challenge and thus I review it for plain error," citing *Davis*. This understanding did not compel a majority in *Kandies* – Judges Michael and Traxler affirmed the denial of relief on the merits, not invoking plain error analysis. *Kandies* was, like Defendant's case, reversed and remanded in light of *Miller-El II*, and, like this case, the Circuit Court remanded to the district court, the Middle District of North Carolina. The Magistrate Judge in *Kandies* has ordered discovery on the *Batson* claim, including depositions of the prosecutor. *See Kandies v. Polk*, No. 1:99CV00764.

*Davis*, and Judge Gregory's separate opinion in *Kandies*, do not square with *Miller-El II*. It is what is before the trial court judge at step three, not what is said about it by counsel, that matters. "There can be no question that the transcript of voir dire, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state court...." *Miller-El*, 545 U.S. at 241, n2. Similarly, this Court was present for all of voir dire and was aware of what transpired.

In any event, the defense in this case *did* object to the reasons given by the prosecution and complained about the cumulative nature of the strikes. Perhaps as a consequence of all of these factors, the government did not argue that the defendant had waived anything in its brief on remand in light of *Miller-El II* in the Circuit Court.

12

way were asked different questions during voir dire based upon their race. *Miller-El*, 545 U.S. at 256-57. Counsel for Defendant does not have copies of the questionnaires and his memory is that the Court collected them at the end of voir dire. However, the government appears to have copies. Defendant requests that the Court determine whether it is possible to provide copies to counsel for Defendant.

  c. Another important source of information is evidence possessed by the government. Evidence of pretext cannot go unrevealed by the government, neither negligently nor intentionally, *see Brady v. Maryland*, 373 U.S. 83 (1963), and the government may not cast their true reasons for actions in a false light. *Napue v. Illinois*, 360 U.S. 264 (1959). It is incumbent under *Miller-El II* and *Brady* that the government reveal any evidence that this Court should consider at step three of the *Batson* inquiry. As an initial manner, Defendant requests that the Court require the government provide the following information:

  1. Complete and unexpurgated copies of the government's copies of juror questionnaires in this case, including all notations regarding the race/gender of the jurors. *See Miller-El*, 545 U.S. at 266 (prosecutor's notes on juror cards);[7]

  2. Complete and unexpurgated copies of any notes, memoranda, and recordings of any kind made by the government in preparation for or during voir dire in this case;

  3. Complete and unexpurgated copies of the government's copies of jury questionnaires with any notes placed thereon in preparation for (or during voir dire) conducted or to be conducted by prosecutors Anne M. Tompkins, Esq., and Jill Westmoreland Rose, Esq., in any and all other cases in which they have participated or are participating as prosecutors;

---

[7]*See* footnote 3, and accompanying text, *supra.*.

4. Any evidence that the United States Attorney's Office for the Western District of North Carolina provides training and instruction, formal or informal, either written, oral, or by electronic means, regarding jury selection to the attorneys in the office. If the answer is yes, the government should be required to provide a description of this training and instruction, including topics, speakers, modes of presentations, and dates. *Id.* (the Sparling Manual);

5. Whether the United States Attorney's Office for the Western District of North Carolina, or any of its attorneys, has or ever has had a training guide, manual, chapter, videotape, audiotape, or other training material regarding jury selection. If yes, then the government should be required to provide all such material to Defendant. *Id.*

6. While prosecuting cases, have Anne M. Tompkins', Esq., and/or Jill Westmoreland Rose's, Esq., jury selection practices regarding peremptory challenges been the subject of a challenge under *Batson v. Kentucky* and its progeny? If the answer is yes, the government should be required to provide the case name, number, and result of the challenges.

7. Have Anne M. Tompkins, Esq., and/or Jill Westmoreland Rose, Esq., ever presented lectures or speeches, or participated on a panel, or written articles or papers or guides, regarding jury selection in criminal cases? If yes, then the government should provide the title, forum, and dates for these activities, and copies of such articles, papers, or guides.

**V. Conclusion**

The defendant respectfully requests that this Court Order a new sentencing proceeding. In the alternative, Defendant respectfully requests that the Court require that the information sought herein be provided to counsel for Defendant and that the Court conduct an evidentiary

14

hearing pursuant to the remand from the Circuit Court.

This the 2nd day of January, 2008.

               s/Harold J. Bender
               Harold J. Bender Bar Number: 0295
               Attorney for Defendant
               Law Office of Harold J. Bender
               200 N. McDowell Street
               Charlotte, NC 28204
               Telephone: (704) 333-2169
               Fax: (704) 333-0837
               hjblaw@bellsouth.net

**CERTIFICATE OF SERVICE**

  This is to certify that a true and correct copy of the above DEFENDANT'S BRIEF has been duly served on the attorney listed below by email service through ECF on this 2nd day of January, 2008.

15

Jill Rose
Assistant District Attorney
Room 223
100 Otis Street
Asheville, NC 28801

16