**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:97CR-23**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

THIS MATTER is before the Court upon remand from the Fourth Circuit Court of

Appeals for further consideration in light of Miller-El v. Dretke, 545 U.S. 231 (2005). The issue

before the U.S. Supreme Court in Miller-El was whether the petitioner had shown that the

prosecution had engaged in purposeful discrimination when it exercised its peremptory strikes

against African-American veniremen. See id. The issue before this Court is whether Barnette

has met his burden of proving that the prosecution engaged in purposeful discrimination when it

exercised peremptory strikes against five African-American veniremen during Barnette's 2002

jury selection.

## FACTUAL HISTORY

The factual history of this case is summarized in the Fourth Circuit's 2004 opinion:

> Barnette met Miss Robin Williams in 1994, and they began dating. Miss
> Williams lived in Roanoke, Virginia, and Barnette resided in Charlotte, North
> Carolina. After dating for about a year, Miss Williams and Barnette began living
> together in an apartment in Roanoke. The relationship flourished at first, but
> Barnette and Miss Williams began to argue over the issue of infidelity.
> According to a neighbor, Barnette abused Miss Williams, and one of Miss
> Williams' friends testified at the sentencing hearing that Miss Williams told her
> that Barnette had slammed Miss Williams into closet doors at the apartment. The
> relationship ended in April of 1996 after a fight in which Barnette attempted to

choke Miss Williams. Barnette moved out of the apartment and returned to Charlotte. On April 29, 1996, Barnette called Miss Williams on the telephone and berated her over why she had broken up with him. Barnette became enraged when he learned that Miss Williams was at her apartment with a male friend. Barnette borrowed his brother's car and drove to Roanoke. Along the way, Barnette filled two containers with gasoline and purchased a baseball bat. Barnette drove to Miss Williams's apartment and parked on a street near the apartment. Barnette took a pair of pliers, the baseball bat, and the containers of gasoline out of the car and walked to Miss Williams' apartment.

Barnette used the pliers to cut the telephone wires at Miss Williams' apartment. Barnette started screaming at Miss Williams and broke a window in the apartment with a baseball bat. Miss Williams' male friend, Benjamin Greene, testified that he was awakened by Miss Williams' screaming on the night of April 30, 1996, at some point between midnight and the break of dawn. He could not remember the exact time. Miss Williams attempted to call the police, but the phone line was dead. According to Greene, Barnette smashed the windows of Greene's car and screamed at Miss Williams, telling her that she was going to die tonight and that he (Barnette) was going to kill her. Sergeant R.S. Kahl of the Roanoke city police department testified that Miss Williams told him that Barnette was screaming "die, bitch, die," and Barnette testified that he did say "die, bitch, die."

Barnette kicked the door in, but it jammed. Barnette poured gasoline from one of the containers through the door and on a window sill. Barnette set fire to the gasoline and moved away from the apartment. Greene testified that Barnette threw a Molotov cocktail into the apartment. According to Greene, the Molotov cocktail set fire to the living room curtains. Barnette then poured gasoline from the other container onto Greene's car and set it afire. Barnette testified that he then heard what he believed to be a bullet zip past his ear. He dropped the bat and began running up the road toward his brother's car. Barnette reached his brother's car and began to drive away. He stopped to pick up the baseball bat. As Barnette picked up the bat, he could see that the apartment was burning.

In the burning apartment, Miss Williams and Greene could not escape through the front door. Instead, they went to Miss Williams' bedroom on the second floor, knocked out a window and the blinds at that window, and jumped from the second story window. Greene was unhurt after escaping the fire. Miss Williams suffered second-degree burns on her right arm and second- and third-degree burns on her left arm. She underwent painful treatment and rehabilitation at the University of Virginia Health System in Charlottesville.

After the arson attack, Miss Williams spoke with Investigator K.O. Hubbard of the Roanoke city police department and identified Barnette as the perpetrator of the crime. Miss Williams gave the police Barnette's address in Charlotte and a description of the car. The Roanoke police obtained felony warrants against Barnette for two counts of attempted murder and two counts of arson/firebombing.

After leaving Miss Williams' apartment, Barnette drove to Charlotte.

Barnette saw his picture on the television news in Charlotte, which reported that he was wanted for a firebombing in Roanoke. Barnette stayed away from his mother's house in Charlotte and took up residence with his cousin in east Charlotte. Barnette did not turn himself in to the police but instead waited for the police to arrest him.

On May 20, 1996, Barnette purchased a 12-gauge Stevens shotgun from a pawnshop in Charlotte using Virginia identification with the name of his brother, Mario Vonkeith Barnette. As part of the transaction, Barnette falsely stated on the federal firearms transaction form that he was neither a previously convicted felon nor a fugitive against whom charges were pending. FN1

> FN1. Barnette was convicted in 1994 in Mecklenburg County, North Carolina Superior Court for felonious restraint. See N.C. Gen.Stat. § 14-43.3.

The Stevens shotgun was defective, and Barnette exchanged it for a Winchester semiautomatic shotgun. Barnette hid the shotgun under his bed for a week before he cut off a portion of the shotgun's barrel and stock to "(m)ake it easier to conceal." Barnette collected shotgun shells, a crowbar, bolt cutters, and a pen flashlight. Barnette stored these items in a bag that he had used as luggage when he went to see Miss Williams. On the day before the murders, Barnette taped the flashlight to his shotgun and coated the lens with a red marker. On the morning of June 21, 1996, Barnette awoke after a night of drinking and, as he testified at the sentencing hearing, he came to the conclusion that this was the day that he and Miss Williams were going to die.

Before midnight on June 21, 1996, Barnette collected his shotgun and bag and walked a mile from his mother's house to the intersection of Billy Graham Parkway and Morris Field Road in Charlotte. Barnette testified that he needed to get to Roanoke to see Miss Williams and that he was going commit [sic] a carjacking to obtain a vehicle to drive to Roanoke. Barnette threw his bag into the bushes near the intersection, loaded his shotgun, crouched down, and waited.

A car came down to the intersection, with the window down and music blaring. Barnette ran to the car, put his shotgun to the window, and ordered the driver out of the vehicle. Barnette directed the driver toward the location of Barnette's bag. Once into the bushes and woods adjacent to the road, Barnette took the driver's wallet and then shot and killed the driver.

The driver was twenty-two-year-old Donald Lee Allen. Barnette shot Allen multiple times and left Allen's body in a ditch by the intersection. Barnette took Allen's blue Honda Prelude and began driving to Roanoke.

Barnette drove to Miss Williams' mother's house in Roanoke and parked Allen's car near the house. At morning twilight on June 22, 1996, Barnette saw Miss Williams come to the front door and let her dog out. Miss Williams' mother, Mrs. Bertha Williams, then came out to pick up her grandchild from a car that dropped her off outside the house. Barnette then moved Allen's car to the alleyway behind the house. Barnette got out of the car, removed his shotgun, and walked toward the back door of the house. Barnette moved through a gate in the

3

fence and proceeded to the back of the house where he cut the telephone lines with wire cutters.

Barnette moved around to the kitchen door. He approached the door and tried to open it. After being unable to open the door, Barnette held back the screen door, held the gun with both hands, aimed at the dead bolt, and began firing. Barnette fired three shells into the door. Barnette entered the house and saw Miss Williams standing on the front porch holding the screen door open. After seeing Miss Williams, Barnette reloaded the shotgun.

Mrs. Williams saw Barnette and told Miss Williams to run. Barnette testified that he did not want to go through Mrs. Williams, and he retreated out the back door of the house. Barnette testified that he knew that Miss Williams ran out by the front gate because he could hear that gate swinging. Barnette also went through the front gate of the fence. After he cleared the gate, Barnette looked for Miss Williams, and he caught sight of her as she came around the back of the duplex. Barnette began to chase her. A neighbor, Sonji Hill, heard the commotion and saw Miss Williams fleeing from Mrs. Williams' house.

Miss Williams fell twice as she tried to flee through a yard and over a hill. After she fell the second time in the nearby yard, Barnette grabbed her and began dragging her with his left hand while holding the shotgun in his right hand. Barnette tried to drag Miss Williams to the car. Miss Hill called the police, but, as she was talking on the phone on her porch, Barnette pointed his shotgun at her and told her to hang up the phone. Miss Hill hung up her phone and went back inside of her house.

Barnette told Miss Williams that he was going to kill her and that he had one shotgun shell for her and one for him. Miss Williams then tried to grab the shotgun from Barnette. As she reached for the shotgun, Barnette pulled back and shot her in her side. Miss Williams lifted her arm up and began to run towards her mother who was coming up the street. As Miss Williams ran toward her mother, Barnette shot Miss Williams in the back. Miss Williams fell right in front of her mother and died a short time later. Barnette testified that the reason he did not put the shotgun to his mouth and kill himself at that moment was because he panicked after seeing what the shotgun shells did to Miss Williams.

Barnette went to Allen's car and began to drive. Barnette drove on Interstate 81 South and arrived in Knoxville, Tennessee. In Knoxville, Barnette purchased some duct tape and a hose. Barnette testified that he attempted suicide by placing one end of the hose in the exhaust pipe of Allen's vehicle and the other end in the window of the car. Barnette did not complete the attempt. Barnette stole a Tennessee license plate and replaced Allen's South Carolina plate with the Tennessee plate.

Barnette left Knoxville and drove back to Charlotte. Barnette abandoned Allen's car at a shopping center in Charlotte on June 24, 1996. Police officers discovered the vehicle that night. In a nearby dumpster, officers discovered Barnette's shotgun with the flashlight taped to it and a bag containing black pants, a black cap, a white towel, a garden hose, bolt cutters, and a crowbar.

Barnette made his way back to his mother's house. After meeting with his

mother, Barnette prepared to meet agents of the FBI, who arrived at the house after Barnette's mother telephoned them. Barnette was taken to an FBI office and given his <u>Miranda</u> warnings. Barnette confessed to both murders and later rode with agents to the location where he had murdered Allen. Barnette also identified the car that he had stolen from Allen.

<u>U.S. v. Barnette</u>, 390 F.3d 775, 779-82, (4th Cir. 2004), <u>vacated</u>, <u>Barnette v. United States</u>, 546 U.S. 803 (2005).

## PROCEDURAL HISTORY

In February, 1997, Barnette was indicted on 11 federal criminal charges, including three that carried a possible death sentence. After a trial by jury in January, 1998, Barnette was found guilty on all counts. After a sentencing hearing, the jury recommended, and the district court imposed, a death sentence on each of the capital counts. The district court also sentenced Barnette to prison on the non-capital counts. Barnette appealed his convictions and death sentences. The Fourth Circuit affirmed his convictions but vacated his death sentences and remanded the case to the district court for resentencing as to the capital counts. <u>See</u> <u>United States v. Barnette</u>, 211 F.3d 803, 825-826 (4th Cir. 2002).

Upon remand, this Court conducted a sentencing hearing, beginning in July, 2002, and a second jury recommended a death sentence for all three capital counts. The Court sentenced Barnette to death on August 20, 2002.

Barnette again appealed his death sentences, challenging, among other things, the Court's <u>Batson</u> rulings with respect to five prospective African-American jurors struck by the prosecution.[1] For the first time, he raised an argument that two white jurors who were accepted

---

[1]In <u>Batson v. Kentucky</u>, the Supreme Court established a three-pronged test for determining if the prosecution purposefully exercised its peremptory strikes in a racially discriminatory manner. 476 U.S. 79, 96-98 (1986).

by the Government had substantially similar views about the death penalty as the five black veniremen who were struck.  Barnette, 390 F.3d at 796.  The Fourth Circuit rejected Barnette's argument on legal grounds, citing Circuit precedent that "'Batson is not violated whenever two veniremen of different races provide the same responses and one is excluded and the other is not.'"  Id. (quoting Matthews v. Evatt, 105 F.3d 907, 918 (4th Cir. 1997)).

The Fourth Circuit affirmed the sentences, and Barnette filed a Petition for Writ of Certiorari in the United States Supreme Court.  Barnette v. United States, 2005 WL 2428403 (Appellate Petition, Motion and Filing ) (U.S. May 19, 2005).  The questions presented did not implicate Batson.  Id.  However, while Barnette's petition was pending, the Court decided Miller-El, which specifically stated that, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." 545 U.S. at 241.  Barnette then filed a supplemental certiorari petition seeking review of the court of appeal's rejection of his Batson claim.  The Supreme Court granted certiorari, vacated the appellate court's judgment, and remanded Barnette's case to the Fourth Circuit "for further consideration in light of Miller-El . . . ."  Barnette v. United States, 546 U.S. 803 (2005).

Barnette filed a motion in the Fourth Circuit to remand the case to the district court.  As part of his motion, Barnette, for the first time, directed the court's attention to a hand-written race and gender notation on the cover sheet of a black female juror's questionnaire that the Government had included in the Supplemental Joint Appendix.  (Supplemental J.A. 143.) Barnette argued that because the race and gender of each juror was provided by the juror elsewhere in the questionnaire, the presence of a race and gender notation on the cover sheet of the questionnaire was evidence that prosecutors acted with discriminatory purpose in selecting

the jury.

The Fourth Circuit remanded the case to the district court "for further consideration in light of Miller-El. . . . ." United States .v. Barnette, No. 02-20 (4th Cir. filed Aug. 28, 2007). Upon remand, this Court sought input from the parties regarding how it should proceed in light of the Fourth Circuit's mandate. (Doc. 634.) Barnette filed a brief advocating a new sentencing proceeding or, in the alternative, an evidentiary hearing. (Doc. 637.) Barnette also sought wide-ranging and far-reaching discovery. See id. The Government advocated a new Batson hearing, focusing only on the third step in the Batson analysis, but argued against discovery of any kind for Barnette. (Doc. 638.) Deferring consideration of all discovery issues, the Court ordered the Government to submit unredacted copies of all juror questionnaires in its possession for in camera review. (Doc. 645.) The Government complied and, although not requested to do so, also provided copies of notes taken by prosecutors during voir dire.

After reviewing the questionnaires, the voir dire transcript, and the prosecutors' voir dire notes, the Court issued an Order construing Barnette's post-remand brief (Doc. 637) as a motion for discovery and the Government's post-remand brief (Doc. 638) as a response opposing the motion for discovery. (Doc. 649.) The Court denied discovery but set a hearing for the Government to explain the presence of race and gender notations on the cover sheets of questionnaires from the in camera submission. See id.

The hearing was held on September 21, 2009. Present were Barnette, his attorneys, Harold Bender and Claire Rauscher, Jeffrey Kahan, of the Department of Justice, Jill Rose of the Office of the United States Attorney for the Western District of North Carolina, and Anne Tompkins. Ms. Rose and Ms. Tompkins were the prosecutors for Barnette's 2002 sentencing hearing. At the time of the hearing, Ms. Tompkins was an attorney in private practice. In April,

7

2010, she became the United States Attorney for the Western District of North Carolina.

At the hearing, the Court questioned Ms. Rose and Ms. Tompkins about race and gender notations on the cover sheets of some of the questionnaires that the Government had submitted for <u>in camera</u> review. Ms. Rose and Ms. Tompkins were not sworn as witnesses but appeared as officers of the court, as they would have at a <u>Batson</u> hearing. They were not subject to questioning by the defense. <u>See</u> <u>United States v. Tindle</u>, 860 F.2d 125, 130-131 (4th Cir. 1988); <u>United States v. Garrison</u>, 849 F.2d 103, 106 (4th Cir. 1988).

On February 5, 2010, Barnette filed a post-hearing brief. (Doc. 658.) The Government filed its post-hearing brief on February 25, 2010. (Doc. 659.)

## DISCUSSION

### A. **<u>Batson</u> and <u>Miller-El</u>**

The Supreme Court's opinion in <u>Batson</u> is cited for the long-standing constitutional principle that the government may not use a peremptory strike against a potential juror solely on the basis of the prospective juror's race or on the assumption that jurors of a particular race will be unable to consider impartially the government's case against a defendant of the same race. 476 U.S. at 89. In order to demonstrate a violation under <u>Batson</u>, a "defendant must first make a <u>prima facie</u> showing of purposeful discrimination. Once the defendant establishes a <u>prima facie</u> case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the challenge." <u>United States v. Grimmond</u>, 137 F.3d 823, 833-34 (4th Cir. 1998) (citations omitted). "If the prosecutor satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination." <u>Id.</u> at 834 (citation omitted). The defendant must "show both that [the Government's stated reasons for a strike] were merely pretextual <u>and</u> that race was the real reason for the strike." <u>United States v. McMillon</u>, 14 F.3d

948, 953 (4th Cir. 1994) (emphasis added). "This final step involves evaluating the 'persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam)).

In Miller-El, the Supreme Court considered a variety of evidence in determining that Miller-El, a habeas petitioner, had met his burden of proving purposeful discrimination under Batson. 545 U.S. at 240-64. The Court considered the number and percentage of African-Americans struck, id. at 240-41; side-by-side comparisons of some black venire panelists who were struck and white panelists who were allowed to serve, id. at 241-52; the prosecutor's use of a procedural mechanism (a "jury shuffle") to move African-American veniremen to the back of the panel where they were less likely to be selected, id. at 253; evidence of a contrast between the prosecutor's voir dire questions posed to black and non-black panelists which suggested an attempt by the prosecutor to create cause to strike or a reason for excluding black panelists, id. at 255-63; the prosecutor's hand-written notes of the race of each juror on the juror cards, id. at 264; and evidence of a systematic policy or practice within the prosecutor's office of excluding minorities from jury service, id. at 263-64.

## B. The Appellate Court's Mandate

The threshold determination for this Court is to interpret the Fourth Circuit's mandate. When the United States Supreme Court granted certiorari, vacated the judgment, and remanded Barnette's case to the Fourth Circuit "for further consideration in light of Miller-El v. Dretke," Barnette, 546 U.S. at 803, the Court was not taking the position that Miller-El actually affected the outcome of United States v. Barnette, 390 F.3d 775 (4th Cir. 2004). See United States v.

M.C.C. of Florida, Inc., 967 F.2d 1559, 1562 (11th Cir. 1992) (discussing the parameters of the mandate when a superior court remands for further consideration in light of a new legal decision).  Instead, it was instructing the Fourth Circuit to make that determination.  See id.  In turn, the Fourth Circuit turned that task over to this Court when it remanded Barnette's case "for further consideration in light of Miller-El . . . ."  United States .v. Barnette, No. 02-20 (4th Cir. filed Aug. 28, 2007).  Therefore, the mandate is limited in nature.  See M.C.C. of Florida, Inc., 967 F.2d at 1562.  It does not require the Court to nullify all prior proceedings.  See id.  It merely requires the Court to reconsider its opinion with respect to whether Barnette proved purposeful discrimination at his Batson hearing in light of the law set forth in Miller-El.  See id.  Consequently, this Court is free to retain any or all of its prior findings of fact and conclusions of law with respect to Barnette's Batson claim that, upon reconsideration, it determines to be unaffected by Miller-El.[2]  See id.

**C.  This Court's Approach**

When reviewing the pleadings, the appellate decisions, and the Batson hearing transcript in this case, the Court concluded that there were two possible approaches that it could take.  The first, advocated by the parties, would be to hold another Batson hearing whereby the Court's previous rulings as to steps one and two of the Batson analysis would stand, but Barnette would be permitted to put forth any pretext argument or evidence that he wished, notwithstanding his failure to make those arguments at his original Batson hearing.

---

[2]For example, in Miller-El the question before the Supreme Court was whether the state courts' conclusion that the defendant had failed to prove purposeful discrimination under the third step of the Batson analysis was unreasonable.  545 U.S. at 266.  Therefore, this Court's finding that prosecutors offered race neutral explanations for all of their strikes under step two of the Batson analysis is unaffected by Miller-El.  Even if it were affected, this Court perceives no reason to modify or change its findings with respect to steps one and two.

However, this Court can find nothing in Miller-El requiring that a defendant who had a full Batson hearing at trial be permitted on remand from a direct appeal to present evidence of purposeful discrimination that he could have presented at his Batson hearing but did not.[3]  While the Miller-El Court approved a petitioner's ability under federal habeas rules to raise different evidentiary "theories" in the federal courts that he had failed to advance in the trial court, 545 U.S. at 241 n.2, the rules governing petitions for writ of habeas corpus differ from those governing cases tried in federal district court and directly reviewed by a federal appellate court.[4]  For example, under Fourth Circuit law, failure to argue pretext after a race-neutral explanation has been provided waives the original Batson objection.  See Davis v. Baltimore Gas & Elec. Co., 160 F.3d 1023, 1027 (4th Cir. 1998).[5]  More generally, the Fourth Circuit adheres to the rule

---

[3]By "full Batson hearing," the Court means that it addressed all three steps of the Batson analysis and found that Barnette had failed to prove purposeful discrimination.  (J.A. 307:21-308:1; 315:18-20; 327:10-11; 331:25-332:4.)  Barnette has never asserted that he was denied the opportunity to present evidence of pretext.

[4]One of the cases Barnette cites is Reed v. Quarterman, 555 F.3d 364, 371, 372-73, 374 (5th Cir. 2009).  In Reed, the Fifth Circuit concluded that a habeas court must consider a petitioner's theory that the prosecution's failure to strike similarly-situated white jurors was purposeful discrimination even if that theory was not argued in the state courts.  555 F.3d at 372-73.  However, the Reed court did not specifically disavow a prior decision from a direct appeal that stated that when a challenging party alleges that similarly-situated jurors were not struck, the challenging party must prove the allegation by introducing evidence of comparability.  See United States v. Guerra-Marrez, 928 F.2d 665, 673 n.9 (5th Cir. 1991) ("[W]hen an allegation of pretext is raised, the defendant bears the burden of convincing the district court that the proferred reasons are pretextual by introducing evidence of comparability.") (citation and internal quotation marks omitted).

[5]Three panels of the Fourth Circuit, in unpublished opinions, have applied this rule post-Miller-El.  See Lawrence v. Carilion Medical Center, No. 09-1761, 2010 WL 74996, at *1 (4th Cir. Mar. 4, 2010); United States v. Whitfield, 314 F. App'x 554, 556 (4th Cir. 2008) (per curium); United States v. Chapman, 209 F. App'x 253, 264 (4th Cir. 2006).  Furthermore, in Chapman, the court speculated that "failure to argue a specific basis for pretext may likewise constitute a waiver of the right to make that specific challenge to the Batson ruling on appeal." 209 F. App'x at 264.  Two circuit courts have gone farther and refused to review  pretext

that "issues that were not raised in the district court will not be addressed on appeal." Holland v. Big River Minerals Corp., 181 F.3d 597, 605 (4th Cir. 1999) (citations omitted); see also, U.S. v. Walley, 567 F.3d 354, 358 (8th Cir. 2009) (refusing to consider pretext argument raised for first time on appeal because the defendant failed to make that argument in the district court); United States v. Houston, 456 F.3d 1328, 1338-39 (11th Cir. 2006) (refusing to review pretext argument that defendant failed to raise during Batson hearing).

Moreover, although the Supreme Court considered a variety of evidence in finding purposeful discrimination in Miller-El's case, Miller-El itself did not change the nature, quantity, or quality of the evidence that a trial court may consider when assessing the plausibility of a prosecutor's explanations for his peremptory strikes under Batson. In other words, it did not announce new law; it merely applied existing law under Batson to the facts of the case before it. See Golphin v. Branker, 519 F.3d 168, 186 (4th Cir. 2008) ("Miller-El did not alter Batson claims in any way."); Murphy v. Dretke, 416 F.3d 427, 439 (5th Cir. 2005) (explaining that "[t]he Court did not announce any new elements or criteria for determining a Batson claim, but rather made a final factual and evidentiary determination of that particular petitioner's Batson claim"). While Miller-El retained Batson's requirement that the trial judge assess the plausibility of the prosecutor's explanation for striking a juror "in light of all of the evidence with a bearing on it[]", Miller-El, 545 U.S. at 252 (citing Batson, 476 U.S. at 96-97), it did not shift the burden from the defendant to prove purposeful discrimination, see Collins, 546 U.S. at

---

arguments on appeal that the defendant failed to raise in the district court. See U.S. v. Walley, 567 F.3d 354, 358 (8th Cir. 2009) (refusing to consider pretext argument raised for first time on appeal because the defendant failed to make that argument in the district court); United States v. Houston, 456 F.3d 1328, 1338-39 (11th Cir. 2006) (refusing to review pretext argument that defendant failed to raise during Batson hearing).

338.

Barnette disagrees and takes the position that a trial judge has an independent duty under

Miller-El to conduct a thorough search of the record for evidence of pretext notwithstanding a

defendant's failure to put forth evidence of purposeful discrimination at the Batson hearing.

(Doc. 658 9 n.2.)  However, several circuit courts reviewing direct appeals have not recognized

such a duty.  See e.g., United States v. Taylor, 509 F.3d 839, 849 (7th Cir. 2007) (refusing to

fault trial court for failing to recognize prosecutor's misstatements of the record where defendant

bore burden of proving pretext and defendant failed to bring misstatements to the district court's

attention); United States v. Houston, 456 F.3d at 1338-39 (rejecting defendant's argument that

district court had an independent duty to conduct a comparative juror analysis notwithstanding

defendant's failure to alert the district court to existence of similarly situated jurors); but see

United States v. Torres-Ramos, 536 F.3d 542, 560 (6th Cir. 2008) (placing affirmative duty on

district court to examine easily available, relevant material for evidence of pretext even if

defendant fails to point to such material).

This brings the Court to the second approach, and the one the Court has adopted, which

limits reconsideration to the arguments raised at the Batson hearing, and not otherwise waived

on appeal, the issues raised on appeal, and any evidence of purposeful discrimination that was

not discoverable prior to the jury being sworn.  This approach is based on the aforementioned

longstanding principles of waiver, as well as the mandate rule, which "forecloses litigation of

issues decided by the district court but foregone on appeal or otherwise waived, for example

because they were not raised in the district court."  United States v. Bell, 5 F.3d 64, 66 (4th Cir.

1993).

These principles were the basis for the Court's denial of Barnette's non-work product

discovery requests. (Doc. 649 7-8, 11-12.) For example, Barnette has pressed the argument that he has been unfairly disadvantaged on remand because he does not have access to copies of the juror questionnaires.[6] However, setting aside the issue of any notes made by prosecutors on their copies of the questionnaires, the only purpose that would be served by granting Barnette access to the juror questionnaires would be to allow him to raise pretext arguments that he could have made at his <u>Batson</u> hearing but did not. Indeed, the only non-work product related basis Barnette cited for wanting copies of the questionnaires was so that he could look for evidence that the Government had used disparate questioning of jurors based on the jurors' race (Doc. 637 12-13), something that he could have raised at his <u>Batson</u> hearing.[7]

Guided by the foregoing, the Court will reconsider Barnette's statistical argument[8] but

---

[6]Barnette's trial counsel, Harold Bender, submitted an affidavit at the hearing stating that at the direction of the Court, he had returned the defense's copies of the questionnaires to the Clerk of Court at the conclusion of jury selection. (Doc. 650.) Barnette has not provided a citation to the criminal docket, the jury selection transcripts, or the sentencing transcripts that indicates that the Court ordered the defense to return its copies of the questionnaires to the Clerk of Court. Clearly, the Government retained its copies of the questionnaires. The Court also retained its copies, which have been stored in the undersigned's chambers. Nevertheless, the Court acknowledges that the cover sheet on the questionnaires informed prospective jurors that their responses to the questionnaires would be returned to the Clerk of Court after a jury had been selected. (J.A. Vol. I, 144.)

On a related note, counsel for Barnette have more than once stated their belief that during the 2002 sentencing proceeding, the Court ordered that copies of the questionnaires be kept under seal by the Clerk of Court. Barnette has failed to point to any evidence in the record to support counsel's belief, and indeed, no juror questionnaires were placed under seal.

[7]Barnette, in fact, raised a disparate questioning argument when making his <u>prima facie</u> case against the strike of prospective juror Mark Blakeney. He abandoned that argument on appeal.

[8]During his <u>Batson</u> hearing, Barnette argued that discriminatory intent could be inferred from the number of African-Americans peremptorily struck relative to their numbers in the eligible juror pool. The Fourth Circuit referred to this as Barnette's "cumulative effect argument" and considered it abandoned on appeal. <u>See</u> <u>Barnette</u>, 390 F.3d at 796. Barnette contends that he raised it. The Court will give Barnette the benefit of the doubt on remand.

not the disparate questioning argument that he raised with respect to venireman Blakeney. Because the Fourth Circuit addressed the assertion on appeal, the Court also will consider whether D. Edwards and D. Stanford, two white jurors, were similarly situated to the five struck African-Americans who were the subject of Barnette's appeal. Additionally, the Court will consider the relevant evidence and arguments presented at the September 21, 2009 hearing.

## D. The Jury Selection Process

A great deal of care was taken in planning and conducting jury selection in this case. Roughly one month prior to jury selection, over 400 potential veniremen filled out a 129-question questionnaire. (Doc. 567.) The composition of the questionnaire was determined jointly by the two parties with the Court resolving disputes between the two. (Doc. 519.) Both sides were given copies of the completed questionnaires prior to jury selection. (Doc. 567.) In a written Order (Doc. 567), the Court described the jury selection procedure that it would follow and, by separate Order, provided both sides the preliminary instructions that it would give to each group of potential jurors (Doc. 568). Both sides had input on jury selection procedures and the preliminary instructions.

Jury selection began on July 15, 2002. Prospective jurors were called in groups of 30, but after preliminary instructions and questions by the Court, each underwent individual voir dire while the rest of the venire was sequestered. Each side had 20 minutes to question each prospective juror. Motions to strike for cause were made while the panelist was in the box. Some veniremen were not examined but were dismissed with the consent of the parties. Those not struck for cause or hardship were considered "eligible" to serve on the jury. This process continued for 10 days and concluded when 65 eligible jurors had been passed. Two hundred and

twenty-two veniremen appeared for jury selection.[9]

On the 11th day, the parties appeared before the Court to exercise their peremptory strikes.  No jurors were present.  Each side was allowed 20 peremptory strikes for the jury and two for the panel of alternates.  The clerk randomly selected 12 of the 65 prospective jurors, and the Government exercised its first round of peremptory strikes.  The clerk randomly selected eligible jurors to replace those who had been struck until the Government had accepted 12 jurors.  The 12 jurors then were passed to the defense, which exercised peremptory strikes in the same manner until it had accepted 12 jurors.  Those 12 jurors were passed back to the Government, and this process continued until both sides had accepted the same 12 jurors and four alternates.  No back-strikes were permitted.  During this process, two white male jurors were eliminated on renewed motions for cause by the defense, reducing the number of eligible jurors to 63.

Barnette raised Batson objections to six of the Government's strikes.  Before this Court is Barnette's claim that the Government used its peremptory strikes in a racially discriminatory manner when it struck prospective jurors C. Bryson (#121), R. Sanders (#70), D. Moore (#181), K. Sanders (#108), and M. Blakeney (#84).[10]

_____

[9]At the hearing, Barnette complained that he had no way of knowing how many jurors were in the venire because he did not have access to juror questionnaires on remand.  (Hr'g Tr. 7:15-24, Sept. 21, 2009.)  However, this information was available through documents already in Barnette's possession, namely the voir dire transcripts which contained the juror number of every venireman who appeared for jury selection and who either was examined by the Court and/or the parties or dismissed without examination but with the consent of the parties.

[10]On appeal, Barnette abandoned his Batson objection to the Government's strike of E. Pendergrass (#233), a prospective alternate juror.  Barnette, 390 F.3d at 797 n.5.

**E. Analysis**

    **i. Statistical Evidence**

Of the 63 eligible jurors, 16 were African-Americans (9 female, 7 male),[11] comprising 25% of the pool of eligible jurors. Of those 16, 12 were randomly selected by the clerk as jurors or alternate jurors. Of those 12, the Government struck seven, the defense struck two, two served on the jury, and one served as an alternate.

Turning first to selection of the jury, the Government used 11 of a possible 20 strikes, striking six black and five white jurors.[12] The Government used its peremptory strikes in the following manner: 1) a white female; 2) a black female, Bryson; 3) a black female, R. Sanders; 4) a black male, S. Anderson[13] 5) a white female; 6) a black female, Moore; 7) a white female; 8) a white male;[14] 9) a black female, K. Sanders; 10) a black male, Blakeney; and 11) a white male. The Government exercised both of its peremptory strikes when picking the panel of four alternates, striking a black female, Pendergrass, and a white female. The Government accepted a total of three black jurors, L. Lyles (#100), K. Roseboro (#223), and B. Williams (#36), for the jury and one black juror, C. Phifer (#6), for the alternate jury.

---

[11]When making his statistical argument at the <u>Batson</u> hearing, defense counsel erred when he asserted that there were 12 eligible African-American jurors. (J.A. Vol. I, 324:10-18.) The Court became aware of the error during its <u>in camera</u> review of the juror questionnaires.

[12]The defense used only 15 of its strikes, <u>Barnette</u>, 390 F.3d at 797 n. 6, eliminating two black and 13 white jurors.

[13]In the Fourth Circuit's opinion, and in Barnette's pleadings, Anderson (#26) is incorrectly listed as a white male. <u>Barnette</u>, 390 F.3d at 797. Barnette did not object to the Government's strike of Anderson.

[14]In the Fourth Circuit's opinion, and in Barnette's pleadings, this prospective juror, David Miller (#38), is incorrectly listed as a black male. <u>Barnette</u>, 390 F.3d at 797.

The Government used seven of a possible twenty-two strikes to remove 44% of the eligible African-American jurors. The number of black jurors that the Government accepted for both the jury and the panel of alternates, on the other hand, reflected the percentage of African-Americans in the eligible jury pool. In other words, African-Americans made up 25% of the eligible jury pool, and the Government accepted three black jurors for the jury. Had all of them been seated, they would have comprised 25% of the panel. However, the defense struck one of the African-American jurors, Lyles, that the Government had accepted. (J.A., Vol. I, 317.) The Government accepted one black alternate juror and black jurors comprised 25% of the panel of alternates.

Additionally, although the clerk called the numbers of 12 African-Americans, the Government had the opportunity to accept or strike only 11 because the defense struck L. Ray, Jr. (#43), an African-American male, during its first round of strikes. See id. at 320. The Government accepted four of the 11 or 36%, which exceeded the percentage of eligible black jurors. That acceptance rate also exceeded the percentage of eligible black jurors in the group of jurors ultimately subject to strike by the Government. The Government had the opportunity to accept or strike a total of 37 jurors, 11, or 30%, of whom were African-American. Finally, the Government's acceptance rate exceeded the percentage of African-Americans in the original venire (20%).[15]

Furthermore, no negative inference can be drawn from either the pattern or the timing of the Government's strikes. C.f. Miller-El, 545 U.S. at 249-50 (concluding that the prosecutor accepted the lone black member of the jury because at that point in the process he had only four

_____

[15]Of the 222 veniremen, 44 were African-Americans. Twenty-eight were struck for cause or excused for hardship reasons.

unused peremptory strikes, and there remained at least three veniremen who opposed the death penalty). In affidavits submitted with their post-remand brief, see Tindle, 860 F.2d at 128 (considering affidavit evidence as part of Batson remand), both prosecutors stated that twice a day throughout jury selection, they reviewed the questionnaires and their voir dire notes for the eligible jurors that had been passed that day. (Doc. 638 Ex. A: Rose Aff. ¶ 14; Ex. B: Tompkins Aff. ¶ 14.) During those reviews, they determined which jurors they would accept and which they would use a peremptory to strike. See id. The jurors' questionnaires were stacked accordingly. (Rose Aff: ¶ 15; Tompkins Aff: ¶ 15.) At the conclusion of voir dire, prosecutors had 19 questionnaires in the "strike" pile, and that is what they relied on when exercising their strikes. (Rose Aff: ¶¶ 15-16; Tompkins Aff: ¶¶ 15, 17.) Because the jurors' names and numbers were called randomly by the clerk, prosecutors had no way to anticipate which jurors would be called or when. Therefore, adhering to their "pile" system, prosecutors would have accepted Lyles, Roseboro, Williams, and Phifer, no matter when they were called in the selection process.[16] Likewise, they would have struck Bryson, R. Sanders, Anderson, Moore, K. Sanders, Blakeney, and Pendergrass, no matter when they were called in the selection process.

Nevertheless, having determined that they would use 19 strikes if necessary, prosecutors still had an extra strike during selection of the jury that they could have used on Lyles, Roseboro, or Williams had race been a motivating factor. Likewise, when presented with the alternate panel of two black and two white jurors, prosecutors could have struck both black jurors, but they did not. Notably, prosecutors did not strike Phifer, who, as the first alternate juror, would

---

[16]Lyles was accepted in the same round that Bryson, R. Sanders and Anderson were struck. Roseboro and Williams were accepted in the same round that K. Sanders was struck. Phifer was accepted at the same time that Pendergrass was struck.

have served if one of the jurors was dismissed or could not otherwise serve. Statistically, nothing in the prosecutors' strikes points to discriminatory intent.

### ii. Plausibility of the Prosecutor's Race-Neutral Explanations

The credibility of a prosecutor's justification for a strike "can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Miller-El v. Cockrell, 537 U.S. 322, 339 (2003). In this case, the prosecutors' race-neutral explanations for their strikes were justifiable, probable, and reasonable and had a basis in accepted trial strategy.

### a. C. Bryson and R. Sanders

Prospective jurors Bryson and R. Sanders were in the first group of twelve called. When asked her reasons for striking Bryson, the prosecutor noted that on her questionnaire, Bryson had stated that her personal view of the death penalty wavered, that she was not sure if she favored abolishing the death penalty, and that she was uncertain how she felt about the death penalty. The prosecutor also cited Bryson's reference to herself during voir dire as a "straddler" with respect to the death penalty[17] and cited her statements that she was uncertain about how she felt about the death penalty. (J.A. Vol. I, 304:2-10.) As for R. Sanders, the prosecutor explained that she had struck Sanders because of Sanders's uncertainty about whether she could be fair in light of her belief that the death penalty was applied based upon socioeconomic, race, and age factors. See id. at 307:1-8.

---

[17]In the voir dire transcript, Bryson refers to herself as a "straggler" not a "straddler." (J.A. Vol. I, 211:20-21.) However, given the context, it is not clear whether it was the prosecutor or the court reporter who did not hear her correctly.

The Court found that the Government's reasons for striking both Bryson and Sanders were race neutral. See id. at 307:19-20. The Court then reminded defense counsel that the burden of showing purposeful discrimination lay with the defendant and inquired of the defense whether it had anything to offer in that regard. See id. at 307:21-24. The defense responded in the negative.[18] See id. at 307:25. The Court then allowed the Government's strikes. See id. at 308:1.

Prosecutors may strike prospective jurors for any constitutionally valid reason, and it has long been settled in the Fourth Circuit that the government may use a peremptory challenge to strike a venireman who has reservations about capital punishment even if those reservations do

---

[18]As part of its prima facie argument, the defense asserted that Bryson and R. Sanders's "answers were no different than anyone else [sic], any white female or any white male . . . ." (J.A. Vol. I, 302:6-7.) This argument is the basis for Barnette's current, and misleading, contention that he "ask[ed] for the [trial] court to conduct comparative juror analysis." (Doc. 637 2; Doc. 658 2.) However, as the Court pointed out at the time, the Government had not yet stated its reasons for striking either juror, making any comparison impossible. (J.A. Vol. I, 302:6-10.) When given the opportunity after the Government had explained its strikes to produce evidence that these jurors' responses "were no different than anyone else, any white female or any white male," the defense declined to do so. See id. at 307:21-25. In fact, the Fourth Circuit recognized that Barnette raised his comparative juror analysis argument for the first time on appeal. Barnette, 390 F.3d at 796 ("Barnette contends, for the first time on appeal, that the government violated Batson by exercising peremptory challenges on prospective black jurors for stated reasons, yet not striking two white venirepersons who made statements that the defendant claims were similar to those made by the prospective black jurors.").

Indeed, the Bryson and Sanders strikes highlight the problems with Barnette's post-remand argument that the Court had an independent obligation to conduct a comparative juror analysis during the Batson hearing. (Doc. 658 8-9 n.2.) Here, after supposedly asking for comparative juror analysis, Barnette declined to identify any similarly-situated white juror who had been accepted by the Government. In fact, during the Batson hearing, Barnette acknowledged that no white juror had expressed the same sentiments as Sanders had. (J.A. Vol. I, 305:22-25.) Nevertheless, according to Barnette, the Court had a duty to identify jurors that it thought were similarly situated notwithstanding that Barnette either had ignored or rejected the same jurors as dissimilar. While a trial court may not ignore the obvious, the duty Barnette proposes has the potential to put the court in the role of advocate and upend the third prong of Batson which puts the burden of proving purposeful discrimination on the challenging party.

not rise to the level of a challenge for cause. See Brown v. Dixon, 891 F.2d 490, 497 (4th Cir. 1989); see also Hernandez v. New York, 500 U.S. 352, 362-63 (1991) (plurality opinion) ("While the reason offered . . . for a peremptory strike need not rise to the level of a challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character."). A prosecutor also may strike a prospective juror whose opinion of the judicial system has raised doubts about her ability to be fair. See e.g., United States v. Steele, 298 F.3d 906, 914 (9th Cir. 2002).

The record supports the prosecutor's characterizations of both Bryson and Sanders's views on the death penalty. The prosecutor accurately portrayed Bryson's responses to certain death penalty-related questions in the questionnaire. (Supplemental J.A. 220-222.) Additionally, during voir dire Bryson referred to herself either as a "straggler" or "straddler" (J.A. Vol. I, 211:20-21) and expressed a general uncertainty about whether she supported the death penalty. In fact, when making its prima facie case, the defense characterized Bryson's views on the death penalty as she "can't say [she is] really for the death penalty or against it." See id. at 303:15-17.

As for Sanders, on her questionnaire she wrote that "the death penalty is applied to certain cases almost automatically" and that she had "strong feelings against the 'fairness' of the death penalty as applied on [an] individual case basis." (Supplemental J.A. 247.) During voir dire, Sanders expressed the belief that the death penalty was unfairly applied based upon defendants' socioeconomic status, race, and age. (J.A. Vol. I, 138:6-13.) Indeed, defense counsel based her prima facie argument on the assumption that the Government had struck Sanders because she believed that some socioeconomic and racial groups were unfairly singled out for capital punishment. See id. at 305:10-13.

While it certainly is true, as counsel argued, that Sanders ultimately indicated that she could set aside her views on the fairness of the application of the death penalty and that she could follow the law, see id. at 138:10-25, the prosecutor's decision not to accept those assurances at face-value is not evidence of pretext.  See Rice v. Collins, 546 U.S. 333, 341 (2006) ("That the prosecutor claimed to hold . . . concerns despite [the juror's] voir dire averments does not establish that she offered a pretext.").  Barnette, in fact, ignores Sanders's earlier statement that she was not sure that she could be completely fair.[19]  (J.A. Vol. I, 137:15-21.)  Barnette has not pointed to any evidence that the prosecutor did not remain concerned that Sanders might be less willing to impose the death penalty than would someone without similar beliefs.  See Collins, 546 U.S. at 341.  The record reflects that the Court also noted the implication of Sanders's responses, querying defense counsel whether Sanders's views could "indicate an extraneous influence on her decision making process apart from the facts of the case[.]"  (J.A. Vol. I, 306:6-10.)

### b.  D. Moore

The prosecutor's explanation for striking Moore was that when asked whether she could

---

[19]The voir dire colloquy between the prosecutor and Sanders is as follows:

Q:    And do you feel like . . . you could approach this case with a fair and open mind?

A:    I think somewhat, yes, I could.

Q:    Somewhat?

A:    I believe somewhat, yes.  I don't know.  I just - - you know, as I said on my questionnaire, it's just that some cases, like I said, it's applied, you know, I think unfairly.

(J.A. Vol I, 137:15-21.)

put the Government on an equal playing field with the defendant, Moore had hesitated for a long time before responding that she could. Additionally, the prosecutor expressed concern that Moore's religious beliefs would influence her ability to impose the death penalty. See id. at 314:18-315:13.

After determining that defense counsel had no further argument to make with respect to Moore, the Court found that the prosecutor had stated a race-neutral explanation for striking her. See id. at 315:14-18. The Court then found that there was no purposeful discrimination on the part of the Government in striking Moore.[20] See id. at 315:18-20. The Court based that finding on Moore's "religious bent against the death penalty or throwing in the question whether she could apply it in view of those beliefs and her overall demeanor." See id. at 315:21-23 (emphasis added).

As noted previously, a prosecutor may use a peremptory strike against a venireman who has reservations about the death penalty. See Brown, 891 F.2d at 497. The government also may exercise a peremptory strike on the basis of a prospective juror's demeanor. See United

---

[20]On appeal, Barnette made a number of unfortunate misrepresentations with respect to this Court's actions, including that "[i]n the case of each strike the [District] court observed that a race neutral reason had been given for it and that ended the inquiry." (Supplemental Brief of Appellant, 2006 WL 2432027 *13.) On the contrary, the Court reached the third step of the Batson inquiry in the case of each strike (J.A. Vol. I, 307:21-308:1; 315:18-20; 327:10-11; 331:25-332:4), explicitly finding no purposeful discrimination and explaining its reasons for doing so in three of them, see id. at 315:18-20; 327:10-11; 331:25-332:4. Barnette also contends that the Court failed to assess the credibility of the prosecutor's race-neutral explanations. However, a finding that the Government did not act with purposeful discrimination necessarily implies that the Court found the prosecutors' explanations credible. See Hernandez, 500 U.S. at 365 (To determine whether a defendant has met his burden of showing purposeful discrimination, the trial court evaluates the "totality of the relevant facts" to decide "whether counsel's race-neutral explanation for a peremptory challenge should be believed."). Only with respect to Bryson and R. Sanders did the Court not make an explicit finding regarding purposeful discrimination. However, it did not allow the strikes until after the defense had declined to offer any evidence of purposeful discrimination. (J.A. Vol. I, 307:19-308:1.)

States v. Grandison, 885 F.2d 143, 149 (4th Cir. 1989); see also Hernandez, 500 U.S. at 356 (upholding the government's strike of two jurors who, according to the government, were struck because they had answered questions "with some hesitancy"). A prosecutor certainly may use a peremptory strike on a prospective juror who has raised doubts about her ability to be fair.

Barnette does not dispute that Moore hesitated before responding to a question about her ability to put the Government on a level playing field with the defendant. The prosecutor, in fact, noted the hesitation during voir dire. (J.A. Vol. I, 272:7-12.) Although the undersigned has no specific recollection of Moore at this time, one of the reasons cited by this Court for finding no purposeful discrimination was Moore's demeanor, which obviously left an impression at the time. See id. at 315:21-23.

Barnette does dispute the Government's characterization of Moore's ability to impose the death penalty in light of her religion, arguing that Moore stated that she did not think her religious views would have any bearing on whether she could vote for a death sentence. However, Moore never gave a clear indication whether her religious views would affect her ability to consider a death sentence for Barnette. When asked how her religious beliefs factored into her views of the death penalty, Moore stated that according to her religion, "we don't determine those things. . . . [I]t's God's will to say." See id. at 271:12-15. When the prosecutor asked Moore whether she would be able to go against her religion with respect to the death penalty, Moore first gave a response that did not answer the question, then stated, "I don't know." See id. at 271:16-20. After another attempt by the prosecutor to determine Moore's position, Moore responded that she did not think her religion would have any bearing on her decision. See id. at 271:21-272:6.

That the prosecutor claimed to hold concerns about Moore's ability to set aside her

religion's beliefs despite her assurances that she could does not establish that the prosecutor's claim was pretextual. See Collins, 546 U.S. at 341. Barnette has not pointed to any evidence that the prosecutor did not remain concerned that someone with Moore's religious background might be unwilling to impose the death penalty if actually called upon to do so. See id.

Furthermore, the credibility of the prosecutor's race-neutral explanations is bolstered by evidence in the record that the undersigned also questioned Moore's ability to consider the death penalty as a punishment. Unsatisfied by the lack of clarity in Moore's responses during the Government's voir dire, the Court asked her whether, given her personal beliefs, she could consider both punishments or was predisposed in favor of one punishment. (J.A. Vol. I, 273:17-274:17.) During the Batson hearing, the Court referred sua sponte to Moore's "it's God's will to say" response, see id. at 315:8-9, and the Court cited Moore's religious beliefs as one of its reasons for finding no purposeful discrimination. See id. at 315:21-23.

### c. K. Sanders

As for prospective juror K. Sanders, the prosecutor characterized Sanders's questionnaire responses as indicating a "hesitancy about her ability to consider the death penalty." The prosecutor also stated that Sanders had long hesitations during voir dire before answering questions about her opinion regarding the death penalty. In particular, the prosecutor asserted, Sanders had a very long hesitation before answering whether she could consider the death penalty, and she gave what the prosecutor characterized as a very hesitant answer. The prosecutor also characterized Sanders as "somewhat uncommunicative" with the Government. See id. at 325:16-326:14.

The Court found that the prosecutor had provided a race-neutral explanation for striking Sanders. After considering the arguments of both parties, the Court found that the Government

had not acted with purposeful discrimination.  See id. at 327:8-11.  The Court cited Sanders's demeanor and the overall context of her answers to support that finding.  See id.

As noted previously, a prosecutor may use a peremptory strike against a venireman who has reservations about the death penalty.  See Brown, 891 F.2d at 497.  The government also may exercise a peremptory strike on the basis of a prospective juror's demeanor.  See Grandison, 885 F.2d at 149.

The Government's characterization of Sanders's questionnaire responses is supported by the record.  (Supplemental J.A. 301-304.)  Barnette does not dispute that Sanders had lengthy hesitations during voir dire before answering questions about her opinion on the death penalty.  Nor does Barnette dispute the Government's characterization of Sanders as uncommunicative with the prosecution.  Finally, although the undersigned has no specific recollection of Sanders, her demeanor during voir dire obviously left an impression at the time.  The reasons cited by this Court for finding no purposeful discrimination were Sanders's demeanor and the overall tenor of her responses.  (J.A. Vol. I, 327:8-11.)

### d.  M. Blakeney

The prosecutor offered several reasons for striking Blakeney, including that he was hesitant in his answers during voir dire.  However, the Government's primary reasons for striking Blakeney were that his views on the death penalty were not very strong, and he stated during voir dire that he did not want to sentence anyone to death.  See id. at 331:13-17.

The Court found that the Government had provided a race-neutral explanation for the strike.  In finding that there had been no showing of purposeful discrimination, the Court considered the arguments of both sides, including a disparate questioning argument advanced by

27

the defense,[21] and the overall pattern of strikes by the Government.  See id. at 331:25-332:4.

As noted previously, a prosecutor may use a peremptory strike against a venireman who has reservations about the death penalty.  See Brown, 891 F.2d at 497.  A prosecutor certainly may use a strike against a prospective juror whose statements signal an unwillingness to impose the death penalty.  See e.g., Hernandez, 500 U.S. at 362-63 ("While the reason offered . . . for a peremptory strike need not rise to the level of a challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character.").

The record indicates that the prosecutor did not misrepresent Blakeney's position on the death penalty.  In response to the question:  "What is your personal view of the death penalty?", Blakeney wrote, "not very strong" on his questionnaire.  (Supplemental J.A. 328.)  During voir dire, he indicated that he did not have an opinion about the death penalty and that he had not really thought about the issue.  (J.A. Vol. I, 190:4-13.)

While the undersigned has no independent recollection of hesitancy on Blakeney's part,

---

[21]Barnette argued that the prosecutor had attempted immediately to find a reason to strike Blakeney by asking him whether his employer knew that he was being considered for jury duty. (J.A. Vol. I, 329:21-25.)  Defense counsel contended that it was the first time that prosecutors had asked a juror that question.  See id. at 329:13-20.  The Court rejected counsel's argument, observing that it had encouraged both sides to address as quickly as possible "any potential conflict that would possibly resolve the question of that juror's readiness to be a juror[.]"  (J.A. Vol I, 331:18-22; Trial Tr. Vol. 1 Afternoon 216:17-217:8.)  Barnette abandoned this argument on appeal.  See, e.g., Holland, 181 F.3d at 605.  Because Barnette declined to pursue this pretext argument on appeal, the Court will not reconsider it.  See Bell, 5 F.3d at 66.

Nevertheless, after having read the voir dire transcripts and reviewed Blakeney's questionnaire, the Court notes that Blakeney left almost all of the employment-related questions on his questionnaire blank, making it logical for prosecutors to begin their voir dire with that subject.  (Supplemental J.A. 307; J.A. Vol. I, 187:4-5.)  Furthermore, defense counsel's contention that Blakeney was the first juror asked whether his employer knew about his possible jury duty was factually inaccurate.  (Trial Tr. Vol. II Morning, 344:22-23; Vol. II Afternoon, 366:1-3; Vol. 3 Morning, 544:17-20, 577:13-18, 628:20; Vol. 3 Afternoon, 702:202-5; Vol. 4 Afternoon, 913:25-914:7, 943:13-15; Vol. 5 1072:17-19.)  In fact, the prosecutors asked almost every juror how jury service might impact his or her work, employer, or childcare.

there is evidence in the voir dire transcript to support the prosecutor's characterization. See id. at 194:4-8. When the prosecutor began questioning Blakeney about his ability to participate in the deliberative process, Blakeney answered that he might not be comfortable doing so because he did not want to sentence anyone to death. See id. at 193A:19-193B:1-7. It appears from the transcript that when the prosecutor attempted to clarify whether Blakeney would be able to vote for the death penalty despite his desire not to, Blakeney hesitated before responding that he could. See id. at 194:4-8.[22] Barnette did not dispute the prosecutor's characterization of Blakeney as hesitant, nor does he do so here.

Furthermore, Barnette cannot dispute that Blakeney had reservations about the death penalty in light of his statement, "I don't want, . . . to sentence nobody to death." See id. at 193B:1-7. Instead, Barnette argues that Blakeney's sentiments should be a desirable quality in any juror. While that certainly is an understandable position for a capital defendant to take, it was not unreasonable for prosecutors to interpret Blakeney's statement and his responses to subsequent questions as an unwillingness to impose the death penalty.

The prosecutor's decision to strike Blakeney notwithstanding his statements that he could participate in the deliberative process and vote for the death penalty is not evidence of pretext.

---

[22]The voir dire colloquy between the prosecutor and Blakeney is as follows:

Q: But if the law takes you there, the facts take you there, would you be able to [vote for the death penalty]?

A: Yes.

Q: And you're hesitating. Tell me why you're hesitating in answering that.

A: I've never done it before.

(J.A. Vol. I, 194:4-8.)

See Collins, 546 U.S. at 341. Barnette has not pointed to any evidence that prosecutors did not remain concerned that, in light of the reluctance expressed during voir dire, Blakeney ultimately might not be willing to vote for the death penalty. See id.

### iii. Comparative Juror Analysis

The credibility of a prosecutor's race-neutral explanation also may be evaluated by considering the consistency with which it was applied. See Miller-El, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."). On appeal, Barnette argued for the first time that the five aforementioned African-American panelists were similarly situated to two white jurors, D. Edwards (#104) and D. Stanford (#222). Barnette, 390 F.3d at 796. Barnette argues that Edwards, Stanford, and the five struck African-Americans gave substantially similar responses about their ability to consider the death penalty, but the prosecution accepted only Edwards and Stanford to sit on the jury.

However, Moore and K. Sanders were struck on the basis of multiple factors, a fact that Barnette ignores. Assuming for the sake of argument that Edwards, Stanford, Moore, and Sanders said substantially the same things about their ability to consider the death penalty, the Court cannot ignore that what led prosecutors to question what Moore and Sanders said was their demeanor during voir dire. Prosecutors described both women as hesitant and Sanders as uncommunicative. Barnette did not dispute those descriptions then, nor does he do so now. Because Barnette failed during the Batson hearing to assert that Edwards and Stanford were similarly situated to Moore and Sanders, this Court had no reason to recall either Edwards or Stanford's demeanor or whether they hesitated when answering prosecutors' questions during

30

voir dire.  The Court likewise had no reason to recall whether either was particularly

uncommunicative with prosecutors.  Certainly, neither said anything during voir dire to indicate

that she would have trouble putting the Government and the defendant on an equal footing as

Moore did.  Nor did either indicate that she held religious beliefs that might compromise her

ability to vote for the death penalty.  Consequently, Barnette cannot show that either Edwards or

Stanford were similarly situated to Moore or Sanders.

Nor can Barnette show that Edwards or Stanford was similarly situated to Blakeney,

who, like Moore and Sanders, was struck for multiple reasons.  Blakeney was struck because of

his hesitancy during voir dire, the weakness of his views on the death penalty, and his statement

indicating a reluctance to vote for the death penalty.

Setting aside the relative strength of their views on the death penalty, Blakeney is

distinguishable from Edwards and Stanford because of his expressed reluctance to vote for it.

Not only did Blakeney state that he did not want to sentence someone to death, the record

indicates that he hesitated before responding that he would be able to vote for the death penalty

in spite of his reluctance to do so.  (J.A. Vol. I, 194:4-8.)  There is nothing in the transcript to

indicate that either Edwards or Stanford displayed a similar reluctance.  Nor did either say

anything to call into question her ability to vote for the death penalty, if she thought the case

warranted it.  Neither Edwards nor Stanford was similarly situated to Blakeney.

The Court notes also that the Government did not accept any eligible white panelist who

expressed doubt about his or her ability to vote for the death penalty.  See e.g., United States v.

Hart, 544 F.3d 911, 915 (8th Cir.2008) (no Batson violation where all venire panel members

similarly situated to African American veniremen were struck).  The Government struck a white

prospective juror, Mills (#15), who expressed support for the death penalty, but who also

stated, "if you said do you believe in the death penalty, I would say yes, like I previously mentioned. However, like I said, never having to make that decision for someone, I can't be certain, you know – that I would want to do it." (Tr. Vol. II Afternoon, 410:15-20.) The Government struck another white panelist, Robinson (#186), who indicated on her questionnaire that while she believed in the death penalty in certain cases, she was not sure that she could be part of making the decision to sentence someone to death. (Tr. Vol. 9 Morning, 1843:7-9.) When asked by the Court about that statement, Robinson responded: "Well, I have never been faced with that before so I certainly am a little unsure of my ability to do that." See id. at 1843:16-18.

On the other hand, the Government accepted a black juror, Williams, who stated, "I wouldn't want nobody to say my vote . . . put somebody to death." (Tr. Vol. 3 Morning, 604:22-23.) However, when questioned about that statement, Williams clarified that he did not want to be solely responsible for sentencing someone to death and emphasized that he understood that a death sentence required a unanimous jury.[23] He otherwise expressed no doubt about his ability to

---

[23]Williams's colloquy with the prosecutor is as follows:

Q: Now, you said you would hate to think that your vote –

A: Mine alone.

Q: Yours --

A: Mine alone.

Q: Now, . . . you would apply the evidence as you've heard it to the law to make your determination as a jury of twelve, both individually and as being a part of the jury.

- - -

Q: So your vote alone –

vote for the death penalty.

R. Sanders was struck because of doubt about her ability to be fair to the Government in light of her belief that the death penalty was unfairly applied. In acknowledging that she might not be able to be fair because of that belief (J.A. Vol. I, 137:15-21), Sanders raised the possibility that her sentencing decision might not be based on the facts of the case and the law as given to her but on whether she thought Barnette had been unfairly singled out for capital punishment.

When arguing its <u>prima facie</u> case with respect to Sanders, the defense acknowledged that no white panelist had expressed beliefs similar to Sanders's. <u>See id.</u> at 305:22-25.[24] Undeterred by this admission, and evidently unconcerned about wasting the Court's time, Barnette now contends that jurors Edwards <u>and</u> Stanford were similarly situated to Sanders. However, neither Edwards nor Stanford gave any indication that she held beliefs similar to Sanders's or that might

---

A: Would not do it.

Q. – wouldn't do it, but you would be obligated –

A. Yes.

Q. – to cast a vote.

A: Yes.

(Tr. Vol. 3 Morning, 605:9-606:1.) Williams went on to confirm that if the Government met its burden, he could vote for the death penalty. <u>See id.</u> at 606:2-14.

[24]Williams, like Sanders, expressed doubts about the fairness of the death penalty. (Tr. Vol. 3 Morning, 603:21-22.) However, unlike Sanders, he did not attribute that unfairness to discriminatory application. Instead, he attributed it to wrongful convictions, opining that "a lot of people are on death row for things they didn't do." <u>See id.</u> at 603:18-19. Also, unlike Sanders, Williams did not give any indication that he might not be able to be fair in light of his beliefs. Indeed, because there was no question of Barnette's guilt, prosecutors would not have had the same concern about an extraneous influence on Williams's decision-making as they did about Sanders's.

impact her ability to be fair.  Nor did either admit holding a set of beliefs that might constitute an extraneous influence on her decision-making.  Consequently, Barnette has not shown that either Edwards or Stanford was similarly situated to Sanders.

Finally, Bryson was struck because of answers that she gave on her questionnaire and during voir dire that indicated that she was uncertain about whether she supported the death penalty.  Bryson bears no similarity to Edwards, and although her questionnaire answers were similar to Stanford's, Bryson's voir dire answers revealed an uncertainty with respect to the death penalty not present in Stanford's.

Based upon her questionnaire alone, juror Edwards bears no resemblance to Bryson.  For example, Bryson answered "Not sure" to the question:  "Would you favor abolishing the death penalty?"  (Supplemental J.A. 221.)  Edwards answered "Probably Not."  (Second Supplemental J.A. 51.)  When asked, "If you favor the death penalty, do you favor it very strongly, somewhat strongly, not very strongly at all, or other," Edwards checked "somewhat strongly."  See id. at 52.)  Bryson did not answer the question at all.  (Supplemental J.A. 222.)  The panelists also were given a list of descriptions and asked to pick the one that described their attitude toward the death penalty.[25]  Bryson checked "I am uncertain how I feel about the death penalty."  See id.  Edwards checked "once the death penalty is imposed, courts should enforce it more promptly."  (Second Supplemental J.A. 52.)  When asked for an opinion on the death penalty, Bryson wrote "my

---

[25]The choices were:
The death penalty is acceptable, but it should be imposed in fewer cases than it is.
The death penalty should probably be imposed more frequently than it is.
The death penalty should be abolished because it is wrong.
Once the death penalty is imposed, courts should enforce it more promptly.
I am uncertain how I feel about the death penalty.

(Supplemental J.A. 222.)

personal view of the death penalty waivers. Sometimes I'm in favor of it. Other times I'm not."
(Supplemental J.A. 220.) Edwards wrote, "I think when warranted, the death penalty should be
carried out." (Second Supplemental J.A. 50.) She commented further that, "while I think the
death penalty is horrible for all involved, I do think it should be carried out when the crime
warrants it." See id. at 51.

Deana Stanford's questionnaire responses, on the other hand, were similar to Bryson's.
Like Bryson, she checked "not sure" in response to the question, "Would you favor abolishing the
death penalty?" See id. at 24. She also checked "I am uncertain how I feel about the death
penalty." See id. at 25. However, in response to a question directed only at supporters of the
death penalty, Stanford checked a box indicating that she favored the death penalty "not very
strongly at all," see id., while Bryson did not answer the question (Supplemental J.A. 222).

Any uncertainty regarding Stanford's views on the death penalty disappeared during voir
dire. A comparison of the voir dire transcripts shows that Stanford's responses to death penalty-
related questions were similar to Edwards's,[26] not Bryson's.

When asked her opinion on the death penalty, Edwards responded that if the situation
warranted it and the law allowed it in that case, she thought she could impose it. (J.A. Vol. I,
151:18-152:4.) In response to the same question, Stanford stated, "I think in certain
circumstances that it's probably warranted." See id. at 283:6-7.[27] When asked to reconcile her

---

[26]They also were similar to jurors Reinhardt (#266) (Tr. Vol. 10 Afternoon, 2249:25-
2250:1), Fowler (#226) (Tr. Vol. 10 Morning, 2076:10-12), and Phifer (alternate) (Tr. Vol. II
Morning, 317:2-15) and to veniremen Lyles (#100) (Tr. Vol. 7 Morning, 1325:12), Joles (#231)
(Tr. Vol. 10 Afternoon, 2178:21-22), and Young (#172) (Tr. Vol. 8 Afternoon, 1687:22), who
were accepted by the Government but struck by the defense.

[27]In his post-hearing brief, Barnette asserts that Stanford stated during voir dire that she
was uncertain how she felt about the death penalty. (Doc. 658 25 ¶3.) That is an incorrect

questionnaire response that her support for the death penalty was not very strong and her voir dire response that in certain circumstances the death penalty was warranted, Stanford reiterated that her support for the death penalty "depend(ed) on the case." See id. at 283:19. In short, both jurors expressed conceptual support for the death penalty but stressed that its application should depend upon the case. The only job then for the prosecutor was to persuade Edwards and Stanford that Barnette's was one of the cases in which the penalty was appropriate.

Not so with Bryson. Unlike Edwards and Stanford, Bryson never articulated a reliable or consistent conceptual support for the death penalty, much less expressed a willingness to impose it. When asked for her opinion on the death penalty, Bryson stated, "I can't really say. . . . I can't say I'm really for the death penalty or totally against it. I really haven't formed any serious hard core judgment on that." See id. at 211:6-9. In response to the prosecutor's follow-up question, Bryson explained, "I guess for the most part I fell [sic] like I've kind of been a straggler [or straddler]. Sometimes I'm for; sometimes I'm against. It's really nothing I've ever considered, you know, am I for it or am I against it." See id. at 211:19-23. Her reliability as a juror for the prosecution became even more doubtful when she acknowledged during the defense's voir dire that she was "really unsure" of her feelings about the death penalty.[28] See id. at 220:25-221:4.

_____

representation of the record. Stanford never stated during voir dire that she was uncertain how she felt about the death penalty. Instead, she explained that she neither supported the death penalty in every case nor opposed it in every case. (J. A. Vol. I, 283:15-23.)

[28] The colloquy between defense counsel and Bryson was as follows:

Q: "Your feeling about the death penalty is sort of, "I'm really unsure."

A: "That's because I am too."

Q: "No, I'm trying to ask you, you are unsure, right?"

Here, Barnette is comparing two jurors who supported the death penalty to a prospective juror whose views on the death penalty were equivocal at best. For the aforementioned reasons, Bryson was not similarly situated to either Edwards or Stanford.

### iv. Race/Gender Notations on Government Copies of Questionnaires

Barnette contends that the prosecutors' hand-written notes on the cover sheets of veniremen's questionnaires show that they were motivated by race when exercising their peremptory strikes. As indicated previously, the Government included in the appellate Supplemental Joint Appendix one complete copy of a prospective juror's questionnaire, that of Betty Campbell, whose removal for cause was challenged on appeal. See supra p.6. On the cover sheet of Campbell's questionnaire was the hand-written notation "B/F" for black female. (Supplemental J.A. 143.) During its in camera review of the Government's copies of juror and prospective juror questionnaires, the Court found others with a race and gender notation on the cover sheet. Barnette argues that there was no constitutionally valid reason for prosecutors to note the race and genders of the veniremen on the cover sheets because identical information was contained in the body of the questionnaires.

At the September 21, 2009 hearing, prosecutors explained the presence of the race and gender notations on Campbell's and other veniremen's cover sheets. To understand those explanations, and Barnette's arguments on this issue, a description of the questionnaire used in his trial is necessary. Each questionnaire was 14 double-sided, stapled pages. The first page was a cover sheet. On the face of the cover sheet were the venireman's juror number and instructions

A: "That's correct."

(J.A. Vol. I, 220:25-221:4.)

on how to complete the questionnaire.  The instructions continued on the reverse side of the cover

sheet.  Below the instructions on the reverse side of the cover sheet were the questionnaires' first

questions, which asked, among other things, for the venireman's name, race, and gender.  The

remainder of the questionnaire asked for biographical information and the venireman's opinion

on a variety of subjects deemed relevant by the parties.

All 204 questionnaires submitted by the Government for in camera review[29] had their

cover sheets intact.  Of the 204 questionnaires, 117 had a race and gender notation on the cover

sheet.  None of the cover sheets had only one or the other.  Of the 117, sixty-four belonged to

eligible jurors.[30]  Eighty-nine of the 117 questionnaires belonged to white jurors (35 male, 54

_____

[29]The Court has included the questionnaires of Betty Campbell and James Donaldson
(#98) in this total, although both questionnaires were missing from the Government's in camera
submission.  The eligibility of each was challenged on appeal, so it is more than likely that the
appellate division of the Department of Justice has the original questionnaires.  Nevertheless,
copies of Campbell's and Donaldson's questionnaires appear in the Supplemental Joint
Appendix, as does a copy of Campbell's cover sheet.  Although it was missing Donaldson's
questionnaire, the Government provided a copy of his cover sheet for in camera review.  The
Government also provided a copy of an intern's sticky note, see infra at pp. 39 and note 31, from
Campbell's cover sheet.  Therefore, the Court included these two complete questionnaires in all
relevant portions of its review.  So, for example, not only were both included in the overall total
of questionnaires submitted, both were included in the number of questionnaires with a race and
gender notation on the cover sheet.

The Court cross-referenced the Government's questionnaires with the jury selection
transcripts and determined that there were 222 veniremen.  Of the other 18 questionnaires
missing from the Government's in camera submission, only one was for an eligible juror, Sean
Mather (#125).  It appears from the transcript that prosecutors did not have a copy of his
questionnaire and had to borrow the Court's copy for voir dire.  (Tr. Vol. 1 Afternoon, 158:15-
19).  The Government did not provide an explanation for why the other questionnaires were
missing, but the Court notes that two were for veniremen who appeared for voir dire on the
wrong day; five were for veniremen dismissed for hardship without being examined by the Court
or either party; and all but one of the remainder appeared on the last afternoon of voir dire.
Because the Court had retained its own copies of the juror questionnaires, it was able to identify
all of the missing jurors, and to include their races and genders in any relevant statistics.

[30]This particular fact was included in the Court's Order setting a hearing in this matter.
(Doc. 649 9 n.9.)  Barnette, in fact, cited this information in his post-hearing brief.  (Doc. 658

female), and 28 belonged to black jurors (14 male, 14 female).

At the hearing, Barnette's prosecutors stated that the race and gender notations on the cover sheets were made either by them or by one of their interns.  (Hr'g Tr. 10:20-11:1, 12:1-2.)  When the Government received its copies of the questionnaires before trial, the prosecutors assigned interns to go through each and note information that might be of interest to the Government – for example, familiarity with domestic violence or a relationship with a murder victim.  See id. at 17:23-18:14.  However, prosecutors particularly were interested in the prospective jurors' views on the death penalty.  See id. at 16:12-16, 17:5-7, 17:24-18:1, 18:13-14.  Neither prosecutor recalled instructing the interns to note the race and/or gender of the prospective jurors.  See id. at 16:2-7, 16:17-18.

The interns made their notations on sticky notes.  See id. at 19:2-3.  With one or two exceptions, the cover sheet of each questionnaire submitted by the Government has a copy of a lined sticky note with a few details about the juror, including his or her position on the death penalty.  Only 48 of the 204 questionnaires have a sticky note with a race and gender notation.[31]

Any other race and gender notations on the cover sheets were made by the prosecutors

_____

10-11.)  The undersigned, therefore, is perplexed as to how Barnette could have concluded that prosecutors made race and gender notations only on minorities' questionnaires.  Id. at 18 ("Plainly the only jurors who had their race and gender hand-written on their jury questionnaires by government prosecutors were African-Americans."), 27-28 (same), 28 (same).  It should go without saying that if race and gender notations were made on all of the eligible jurors' questionnaires, then prosecutors did not make race and gender notations only on the questionnaires of African-Americans.

[31]The 48 are included in the overall total of 117 questionnaires with a race and gender notation.  It is evident from the handwriting on the sticky notes that the questionnaires were split between two interns, only one of whom noted the race and gender of prospective jurors.  Not only is the handwriting on the sticky notes different, but every venireman between #115 and #162 for whom there is a questionnaire had a sticky note with a race and gender notation, all written in the same hand.

themselves.  (Hr'g Tr. 10:20-11:1.)  Ms. Rose stated that during voir dire, prosecutors made notes on the cover sheets, on the interns' sticky notes, and/or on separate paper.  See id. at 18:22-19:5. She identified the writing on Betty Campbell's cover sheet as hers.  See id. at 12:17-18.

Prosecutors explained that they made the race and gender notations for identification purposes.  See id. at 11:3-25; 13:5-18; 14:6-9; 17:8-11; 19:6-9.  Jury selection took place outside the presence of the jurors, days, and in some cases weeks, after voir dire, so prosecutors wanted a quick way to remember jurors who were identified by the clerk only by name and number.  See id.  Additionally, prosecutors anticipated Batson objections and knew that having the race and gender notations would enable them to quickly identify jurors if objections arose.  See id. 14:18-15:8; 17:8-12.

Barnette argues that noting a juror's race and gender "is not a plausible, race-neutral basis for a 'quick recall' of that person" and cites Miller-El.  (Doc. 658 27.)  On the contrary, a person's race and gender are among the most obvious identifying characteristics, and there is nothing constitutionally suspect about noting them provided that it is for identification purposes and not exclusionary ones.  In Miller-El, the Court confronted a situation in which the prosecutor used race notations for exclusionary purposes.  545 U.S. at 263-264, 266.

In that case, each side had a juror card for each member of the venire.  Prior to or during jury selection, Miller-El's prosecutor wrote the race of each juror on his or her card.  See id. at 264.  It is important to note that the Miller-El Court did not find this practice, standing alone, to be evidence of discriminatory intent.  Instead, the Court tied the notations to another factor that it found to be evidence of discriminatory intent – the Dallas County District Attorney's Office's policy of excluding African-Americans from juries.  Id. at 263, 266.  In fact, it was when discussing that policy that the Court cited the prosecutor's race notations on the juror cards.  Id. at

265, 266.  Among the evidence pointing to the existence of the Dallas County DA's exclusionary

policy was testimony that the DA's Office, "by its own admission, [had] used [a jury shuffle]

process to manipulate the racial composition of the jury in the past."  Id. at 254.

In the Texas criminal practice, "either side may literally reshuffle the cards bearing panel

members' names, thus rearranging the order in which members of the venire panel are seated and

reached for questioning."  Id.  "Once the order is established, the panel members seated at the

back are likely to escape voir dire altogether, for those not questioned by the end of the week are

dismissed."  Id.  In Miller-El's case, the prosecutor sought a jury shuffle whenever a

"predominant" number of African-Americans were seated in the front of the panel.  Id. at 254.

The prosecutor also delayed making a formal objection to the defense's shuffle until after the new

racial composition was revealed.  545 U.S. at 254.  Prosecutors undoubtedly were assisted in the

process by the race notations they had made on the jurors' cards.[32]

The differences between Miller-El and Barnette's case are obvious.  There is no evidence

that the U.S. Attorney's Office had a policy to exclude minority jurors.[33]  There was no jury

---

[32]Barnette cites another federal case for the proposition that prosecutors' race notations alone are evidence of discriminatory intent.  (Doc. 658 27 (citing Hardcastle v. Horn, 332 F. App'x 764, 766 (3rd Cir. 2009) (unpublished)).)  However, even a cursory reading of the cited case reveals that it was the prosecutor's race notations combined with her reliance on pre-Batson circuit law approving race-based peremptory challenges that led the Third Circuit to determine that "it was not clearly erroneous for the [district] court to conclude that [the prosecutor] was motivated by race in exercising her peremptory strikes."  Hardcastle, 332 F. App'x at 766.

[33]At the hearing, Barnette introduced a document (Def.'s Ex. A) listing direct appeals to the Fourth Circuit that alleged Batson violations in federal criminal trials in North Carolina since 1997.  (Hr'g Tr. 23:20-24:3.)  Of the eight cases listed, seven originated in the Western District of North Carolina, and two of the appeals were Barnette's own.  Although Barnette did not explain the relevance of this document, it presumably was meant to show a pattern of purposeful discrimination in jury selection among prosecutors in the Office of the U.S. Attorney for the Western District of North Carolina.

In its Order setting the parameters for the September 21, 2009, hearing, this Court stated

shuffle or similar mechanism for prosecutors to use to manipulate the racial composition of the jury. Additionally, as prosecutors emphasized at the hearing, the jury selection procedure used in this case was unusual. While strikes for cause were made while jurors were in the box, peremptory strikes were made at the conclusion of voir dire, after 65 eligible jurors had been passed. The jurors were not present, and their names and numbers were called randomly by the clerk. Consequently, neither side knew in what order the jurors would be called. Manipulation was impossible in such a situation.

Furthermore, the fact that the questionnaire itself asked for jurors' race and gender demonstrates that both parties believed the information was relevant to jury selection. Indeed, neither party could have raised a Batson objection without knowing the race of the juror who was struck. Having that information in the questionnaire helped both parties identify jurors who were no longer in front of them. Defense counsel demonstrated that fact by making a list, albeit an inaccurate one, of the eligible African-American jurors, something they would have been unable to do without looking at the questionnaires or otherwise noting the race of the jurors. (J.A. Vol. I, 324:16-18 ("We've got it written down here somewhere. We had it all broken down by race.").)

that it would accept only evidence that could not have been discovered prior to jury selection in Barnette's 2002 sentencing proceeding. (Doc. 649 12.) Five of the eight appeals that Barnette has listed pre-date his 2002 proceeding and, as such, could have been produced as evidence at his 2002 Batson hearing.

Nevertheless, the Court notes that between 1986, when Batson was decided, and July 2002, when jury selection began in Barnette's resentencing, only five direct appeals originating from federal criminal trials in the Western District of North Carolina alleged Batson violations. One of those was Barnette's appeal from his 1997 convictions and sentences. See United States v. Barnette, 211 F.3d 803 (4th Cir. 2000.) During the same period, there were five direct appeals alleging Batson violations in criminal trials originating in the Eastern District of North Carolina and four originating in the Middle District of North Carolina. Considering the volume of criminal cases prosecuted in the Western District during the same period, the fact that there were five appeals alleging Batson violations is not compelling evidence of a pattern or policy of purposeful discrimination in the U.S. Attorney's Office.

Seizing on the fact that the information was already in the questionnaire, Barnette next accuses prosecutors of racial "hyper-vigilance," arguing that it was not necessary for them to hand-write panelists' race and gender "when it already appears on the <u>face</u> of the questionnaire, unless [they] want[ed] to super-emphasize race so as not to make a mistake and miss it."  (Doc. 658 28) (emphasis added).  The Government, of course, could make the same argument about Barnette's list of jurors "broken down by race."  Regardless, Barnette's argument is misleading because it implies that prosecutors made their race and gender notations alongside the race and gender questions in the questionnaire, essentially doubling the information on the page.  However, as should have been evident from the hearing, and from Betty Campbell's questionnaire, the prosecutors' notes appear on the cover sheet, not in the questionnaire itself.

At a more fundamental level, Barnette's accusation exposes a fatal flaw in his assertion that prosecutors' race and gender notations displayed discriminatory intent.  Barnette's argument is that by writing on the cover sheet that which was already in the body of the questionnaire, prosecutors demonstrated discriminatory intent.  Presumably, then, had prosecutors not written anything on the cover sheet but instead flipped it over to reveal the identifying information on the first page of the questionnaire – the name, race, and gender of the juror– such action would not have been evidence of discriminatory intent.  The fact that prosecutors chose instead to leave each cover sheet in place and write the name and, in some cases, the race and gender of the juror on it is a distinction without a difference.  At bottom, Barnette's criticism is that prosecutors worked from one page, rather than the other.

The prosecutors use of the cover sheets is understandable.  The juror numbers already were on them, and that is where the interns had put their sticky notes.  Prosecutors added each

venireman's name to his or her cover sheet[34], as well as other identifying information.  (Hr'g Tr. 13:6-7; 13:22-14:1; 18:22-19:8.)  On some cover sheets, they added biographical information, recorded a note-worthy response from voir dire, commented on the juror's demeanor, noted their mental impressions of the juror,[35] or did some combination of the aforementioned.  On some cover sheets, prosecutors wrote no identifying information except the juror's name.  Again, however, each cover sheet had an intern-generated sticky note with some relevant information about the juror.  In short, every cover sheet had identifying information on it, and in no case was the sole identifying information the juror's race and gender.

Barnette also questions the prosecutors' assertions that they knew that race and gender notations would help them respond to Batson objections.  (Hr'g Tr. 14:18-15:8, 17:8-12.)  Barnette argues that the explanation "either is not plausible or is evidence of racial animus."  (Doc. 658 28.)

On the contrary, the explanation is plausible.  Both parties and the Court anticipated that the defense would raise Batson objections.  (Hr'g Tr. 14:24-15:10; Third Supplemental J.A. 3.)  Long before jury selection began, Barnette, himself, proposed procedures to handle Government peremptory strikes that might trigger a Batson objection.  (Doc. No. 433 ¶ 4.)  He also filed a motion asking the Court to prohibit the prosecution from peremptorily challenging jurors on the basis of their sex or race.  (Doc. No. 482.)  In the motion, Barnette pointed out several factors that he argued were relevant to his motion, including that he is black, one of the victims was white,

---

[34]Prosecutors explained that they had not known prior to selection whether jurors would be called randomly by number or by name.

[35]In its Order denying Barnette discovery of the Government's copies of the questionnaires, the Court noted that prosecutors had recorded their impressions of some jurors on those jurors' cover sheets.  (Doc. 649 9.)

one of the victims was black and that the venire was likely to include members of both races.[36]  In

short, Barnette signaled that <u>Batson</u> objections were likely.

Therefore, it would have been reasonable trial strategy, and not a sign of racial animus, for

prosecutors to be aware of the demographics of the eligible juror pool so that they could be

prepared to defend against <u>Batson</u> objections.  Statistical arguments or arguments citing the

number of minority jurors struck relative to the number of minority jurors in the venire are

routine in <u>Batson</u> challenges.  In fact, it is this Court's experience that most <u>prima facie</u> cases

begin with those type of arguments.  This case was no exception.  When Barnette argued

discriminatory intent based upon the number of African-Americans the Government had struck,

prosecutors, without having to ask for time from the Court to go through the questionnaires to

determine the races and genders of those they had struck and those they had accepted, were able

to respond quickly simply by looking at the covers of the questionnaires.  (J.A. Vol. I, 325:6-12

("[W]e've exercised three strikes against white females, four on black females, including Ms.

Sanders, one black male, and one white male.  We have passed black males to the defense . . .

some of whom have been struck by the defendant[.]").)  This Court sees no measurable difference

between the prosecutors' short-hand race and gender notations on the cover sheets and defense

counsel's racially-delineated juror list.  Both facilitated quick identification of jurors for the

---

[36]At the hearing, one of the prosecutors referred to the fact that the victims in this case
were of different races.  (Hr'g Tr. 17:11-16.)  In his post-hearing brief, Barnette characterizes
that reference as one of the reasons prosecutors noted the race and gender of the jurors and
argues that it confirms that the race of the jurors factored into their selection decisions.  (Doc.
658 27, 28-29.)  However, when read in context, it is evident that the prosecutor was explaining
one reason the Government had anticipated <u>Batson</u> objections.  (Hr'g Tr. 17:11-16.)  The Court
finds Barnette's criticism of the prosecution's reference ironic considering his own pre-trial
argument that the races of the victims were relevant to the <u>Batson</u> issue.  (Doc. 482 3 ¶7; J.A.
Vol. I, 324:2-7.)

purpose of raising and defending against <u>Batson</u> objections.

In its <u>in camera</u> review of the Government's copies of juror questionnaires and voir dire notes, the Court found no evidence that the prosecutors purposefully excluded any prospective juror based on that person's race. Likewise, the Court found no evidence to contradict prosecutors' explanations at the hearing that the race and gender notations that they made on the cover sheets of the questionnaires were for identification rather than exclusionary purposes.

## CONCLUSION

Based on the foregoing analysis of the record, the Court finds the following:

1. Jurors D. Edwards and D. Stanford were not similarly situated to prospective jurors Bryson, R. Sanders, Moore, K. Sanders, or Blakeney.

2. The race and gender notations made by prosecutors on the cover sheets of jurors' and prospective jurors' questionnaires were for identification purposes, not exclusionary ones.

3. The prosecutors' race-neutral explanations for striking prospective jurors Bryson, R. Sanders, Moore, K. Sanders, and Blakeney were credible and supported by the record.

4. Barnette failed to prove that the prosecutors' race-neutral explanations for striking prospective jurors Bryson, R. Sanders, Moore, K. Sanders, and Blakeney were pretext for discrimination; and

5. Anne Tompkins and Jill Rose were not testifying witnesses at the September 21, 2009 hearing within the meaning of the Jencks Act, 18 U.S.C. §3500.

Therefore, the prosecutors' use of peremptory strikes to exclude Bryson, R. Sanders, Moore, K. Sanders, and Blakeney as jurors did not violate <u>Batson</u>. 476 U.S. at 89. Additionally,

Barnette is not entitled to discovery under the Jencks Act.  <u>See</u> § 3500(a)-(b) (providing for discovery of some statements made by Government witnesses who "testified on direct examination in the trial of the case").

Signed: May 19, 2010

Richard L. Voorhees
United States District Judge